## EDENFIELD ET AL. *v.* FANE

No. 91-1594.   Argued December 7, 1992—Decided April 26, 1993

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, STEVENS, SCALIA, SOUTER, and THOMAS, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 777. O'CONNOR, J., filed a dissenting opinion, *post*, p. 778.

*Parker D. Thomson*, Special Assistant Attorney General of Florida, argued the cause for petitioners. With him on the briefs were *Robert A. Butterworth*, Attorney General, *John J. Rimes III*, Assistant Attorney General, and *Carol A. Licko*, Special Assistant Attorney General.

*David C. Vladeck* argued the cause for respondent. With him on the brief was *Alan B. Morrison.**

JUSTICE KENNEDY delivered the opinion of the Court.

In previous cases we have considered the constitutionality of state laws prohibiting lawyers from engaging in direct, personal solicitation of prospective clients. See *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978); *In re Primus*, 436 U. S. 412 (1978). In the case now before us, we consider a solicitation ban applicable to certified public accountants (CPA's) enacted by the State of Florida. We hold that, as applied to CPA solicitation in the business context, Florida's prohibition is inconsistent with the free speech guarantees of the First and Fourteenth Amendments.

I

Respondent Scott Fane is a CPA licensed to practice in the State of Florida by the Florida Board of Accountancy (Board). Before moving to Florida in 1985, Fane had his own accounting CPA practice in New Jersey, specializing in providing tax advice to small and medium-sized businesses. He often obtained business clients by making unsolicited telephone calls to their executives and arranging meetings to explain his services and expertise. This direct, personal, uninvited solicitation was permitted under New Jersey law.

When he moved to Florida, Fane wished to build a practice similar to his solo practice in New Jersey but was unable to do so because the Board of Accountancy had a comprehensive rule prohibiting CPA's from engaging in the direct, personal

---

*Briefs of *amici curiae* urging affirmance were filed for the American Advertising Federation et al. by *Richard E. Wiley, Howard H. Bell, Gilbert H. Weil,* and *Robert J. Levering;* and for the American Association of Attorney-Certified Public Accountants, Inc., by *L. Harold Levinson, David Ostrove,* and *Sydney S. Traum.*

*Kenneth R. Hart* filed a brief for the Florida Institute of Certified Public Accountants as *amicus curiae.*

solicitation he had found most effective in the past. The Board's rules provide that a CPA "shall not by any direct, in-person, uninvited solicitation solicit an engagement to perform public accounting services . . . where the engagement would be for a person or entity not already a client of [the CPA], unless such person or entity has invited such a communication." Fla. Admin. Code § 21A–24.002(2)(c) (1992). "[D]irect, in-person, uninvited solicitation" means "any communication which directly or implicitly requests an immediate oral response from the recipient," which, under the Board's rules, includes all "[u]ninvited in-person visits or conversations or telephone calls to a specific potential client." § 21A–24.002(3).

The rule, according to Fane's uncontradicted submissions, presented a serious obstacle, because most businesses are willing to rely for advice on the accountants or CPA's already serving them. In Fane's experience, persuading a business to sever its existing accounting relations or alter them to include a new CPA on particular assignments requires the new CPA to contact the business and explain the advantages of a change. This entails a detailed discussion of the client's needs and the CPA's expertise, services and fees. See Affidavit of Scott Fane ¶¶ 7, 11, App. 11, 15.

Fane sued the Board in the United States District Court for the Northern District of Florida, seeking declaratory and injunctive relief on the ground that the Board's anti-solicitation rule violated the First and Fourteenth Amendments. Fane alleged that but for the prohibition he would seek clients through personal solicitation and would offer fees below prevailing rates. Complaint ¶¶ 9–11, App. 3–4.

In response to Fane's submissions, the Board relied on the affidavit of Louis Dooner, one of its former chairmen. Dooner concluded that the solicitation ban was necessary to preserve the independence of CPA's performing the attest function, which involves the rendering of opinions on a firm's financial statements. His premise was that a CPA who so-

licits clients "is obviously in need of business and may be willing to bend the rules." App. 23. In Dooner's view, "[i]f [a CPA] has solicited the client he will be beholden to him." *Id.*, at 19. Dooner also suggested that the ban was needed to prevent "overreaching and vexatious conduct by the CPA." *Id.*, at 23.

The District Court gave summary judgment to Fane and enjoined enforcement of the rule "as it is applied to CPA's who seek clients through in-person, direct, uninvited solicitation in the business context." Civ. Case No. 88–40264–MNP (ND Fla., Sept. 13, 1990), App. 88. A divided panel of the Court of Appeals for the Eleventh Circuit affirmed. 945 F. 2d 1514 (1991).

We granted certiorari, 504 U. S. 940 (1992), and now affirm.

## II

In soliciting potential clients, Fane seeks to communicate no more than truthful, nondeceptive information proposing a lawful commercial transaction. We need not parse Fane's proposed communications to see if some parts are entitled to greater protection than the solicitation itself. This case comes to us testing the solicitation, nothing more. That is what the State prohibits and Fane proposes.

Whatever ambiguities may exist at the margins of the category of commercial speech, see, *e. g., Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations,* 413 U. S. 376, 384–388 (1973), it is clear that this type of personal solicitation is commercial expression to which the protections of the First Amendment apply. *E. g., Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748, 762 (1976). While we did uphold a ban on in-person solicitation by lawyers in *Ohralik* v. *Ohio State Bar Assn.,* 436 U. S. 447 (1978), that opinion did not hold that all personal solicitation is without First Amendment protection. See *id.*, at 457. There are, no doubt, detrimental aspects to personal commercial solicitation in certain circumstances,

see *id.*, at 464, and n. 23, but these detriments are not so inherent or ubiquitous that solicitation of this sort is removed from the ambit of First Amendment protection, cf. *United States* v. *Kokinda,* 497 U. S. 720, 725 (1990) (plurality opinion) ("Solicitation is a recognized form of speech protected by the First Amendment"); see also *International Society for Krishna Consciousness* v. *Lee,* 505 U. S. 672, 677 (1992).

In the commercial context, solicitation may have considerable value. Unlike many other forms of commercial expression, solicitation allows direct and spontaneous communication between buyer and seller. A seller has a strong financial incentive to educate the market and stimulate demand for his product or service, so solicitation produces more personal interchange between buyer and seller than would occur if only buyers were permitted to initiate contact. Personal interchange enables a potential buyer to meet and evaluate the person offering the product or service and allows both parties to discuss and negotiate the desired form for the transaction or professional relation. Solicitation also enables the seller to direct his proposals toward those consumers who he has a reason to believe would be most interested in what he has to sell. For the buyer, it provides an opportunity to explore in detail the way in which a particular product or service compares to its alternatives in the market. In particular, with respect to nonstandard products like the professional services offered by CPA's, these benefits are significant.

In denying CPA's and their clients these advantages, Florida's law threatens societal interests in broad access to complete and accurate commercial information that First Amendment coverage of commercial speech is designed to safeguard. See *Virginia State Bd. of Pharmacy, supra,* at 762–765; *Bates* v. *State Bar of Arizona,* 433 U. S. 350, 377–378 (1977); *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of N. Y.,* 447 U. S. 557, 561–562 (1980).

The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish. Some of the ideas and information are vital, some of slight worth. But the general rule is that the speaker and the audience, not the government, assess the value of the information presented. Thus, even a communication that does no more than propose a commercial transaction is entitled to the coverage of the First Amendment. See *Virginia State Bd. of Pharmacy, supra,* at 762.

Commercial speech, however, is "linked inextricably" with the commercial arrangement that it proposes, *Friedman* v. *Rogers,* 440 U. S. 1, 10, n. 9 (1979), so the State's interest in regulating the underlying transaction may give it a concomitant interest in the expression itself. See *Ohralik, supra,* at 457. For this reason, laws restricting commercial speech, unlike laws burdening other forms of protected expression, need only be tailored in a reasonable manner to serve a substantial state interest in order to survive First Amendment scrutiny. *Board of Trustees of State University of N. Y.* v. *Fox,* 492 U. S. 469, 480 (1989); *Central Hudson Gas & Electric Corp.,* 447 U. S., at 564. Even under this intermediate standard of review, however, Florida's blanket ban on direct, in-person, uninvited solicitation by CPA's cannot be sustained as applied to Fane's proposed speech.

### III

To determine whether personal solicitation by CPA's may be proscribed under the test set forth in *Central Hudson* we must ask whether the State's interests in proscribing it are substantial, whether the challenged regulation advances these interests in a direct and material way, and whether the extent of the restriction on protected speech is in reasonable proportion to the interests served. See *ibid.* Though we conclude that the Board's asserted interests are substantial, the Board has failed to demonstrate that its solicitation ban advances those interests.

## A

In undertaking the first inquiry, we must identify with care the interests the State itself asserts. Unlike rational-basis review, the *Central Hudson* standard does not permit us to supplant the precise interests put forward by the State with other suppositions. See *Fox, supra,* at 480. Neither will we turn away if it appears that the stated interests are not the actual interests served by the restriction. See, *e. g., Mississippi Univ. for Women v. Hogan,* 458 U. S. 718, 730 (1982).

To justify its ban on personal solicitation by CPA's, the Board proffers two interests. First, the Board asserts an interest in protecting consumers from fraud or overreaching by CPA's. Second, the Board claims that its ban is necessary to maintain both the fact and appearance of CPA independence in auditing a business and attesting to its financial statements.

The State's first interest encompasses two distinct purposes: to prevent fraud and other forms of deception, and to protect privacy. As to the first purpose, we have said that "[t]he First Amendment . . . does not prohibit the State from insuring that the stream of commercial information flow[s] cleanly as well as freely," *Virginia State Bd. of Pharmacy,* 425 U. S., at 771–772, and our cases make clear that the State may ban commercial expression that is fraudulent or deceptive without further justification, see, *e. g., Central Hudson Gas & Electric Corp., supra,* at 563–564; *In re R. M. J.,* 455 U. S. 191, 203 (1982); *Metromedia, Inc. v. San Diego,* 453 U. S. 490, 507 (1981) (plurality opinion). Indeed, 25 States and the District of Columbia take various forms of this approach, forbidding solicitation by CPA's only under circumstances that would render it fraudulent, deceptive, or coercive. See, *e. g.,* Code of Colo. Regs. § 7.12 (1991); N. D. Admin. Code § 3–04–06–02 (1991); N. H. Code Admin. Rules § 507.02(c) (1990); D. C. Mun. Reg., Tit. 17, § 2513.4 (1990). But where, as with the blanket ban involved here, truthful

and nonmisleading expression will be snared along with fraudulent or deceptive commercial speech, the State must satisfy the remainder of the *Central Hudson* test by demonstrating that its restriction serves a substantial state interest and is designed in a reasonable way to accomplish that end. See *In re R. M. J., supra,* at 203. For purposes of that test, there is no question that Florida's interest in ensuring the accuracy of commercial information in the marketplace is substantial. See, *e. g., Virginia State Bd. of Pharmacy, supra,* at 771–772; *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Comm.,* 483 U. S. 522, 539 (1987); *Friedman* v. *Rogers, supra,* at 13.

Likewise, the protection of potential clients' privacy is a substantial state interest. Even solicitation that is neither fraudulent nor deceptive may be pressed with such frequency or vehemence as to intimidate, vex, or harass the recipient. In *Ohralik,* we made explicit that "protection of the public from these aspects of solicitation is a legitimate and important state interest." 436 U. S., at 462.

The Board's second justification for its ban—the need to maintain the fact and appearance of CPA independence and to guard against conflicts of interest—is related to the audit and attest functions of a CPA. In the course of rendering these professional services, a CPA reviews financial statements and attests that they have been prepared in accordance with generally accepted accounting principles and present a fair and accurate picture of the firm's financial condition. See generally R. Gormley, Law of Accountants and Auditors ¶ 1.07[4] (1981); 1 American Institute of Certified Public Accountants, Professional Standards AU § 110.01 (1991) (hereinafter AICPA Professional Standards). In the Board's view, solicitation compromises the independence necessary to perform the audit and attest functions, because a CPA who needs business enough to solicit clients will be prone to ethical lapses. The Board claims that even if actual misconduct does not occur, the public perception of CPA in-

dependence will be undermined if CPA's behave like ordinary commercial actors.

We have given consistent recognition to the State's important interests in maintaining standards of ethical conduct in the licensed professions. See, e. g., *Ohralik, supra,* at 460; *Virginia State Bd. of Pharmacy, supra,* at 766; *National Soc. of Professional Engineers* v. *United States,* 435 U. S. 679, 696 (1978). With regard to CPA's, we have observed that they must "maintain total independence" and act with "complete fidelity to the public trust" when serving as independent auditors. *United States* v. *Arthur Young & Co.,* 465 U. S. 805, 818 (1984). Although the State's interest in obscuring the commercial nature of public accounting practice is open to doubt, see *Bates* v. *Arizona State Bar Assn.,* 433 U. S., at 369–371, the Board's asserted interest in maintaining CPA independence and ensuring against conflicts of interest is not. We acknowledge that this interest is substantial. See *Ohralik, supra,* at 460–461.

## B

That the Board's asserted interests are substantial in the abstract does not mean, however, that its blanket prohibition on solicitation serves them. The penultimate prong of the *Central Hudson* test requires that a regulation impinging upon commercial expression "directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Central Hudson Gas & Electric Corp.,* 447 U. S., at 564. We agree with the Court of Appeals that the Board's ban on CPA solicitation as applied to the solicitation of business clients fails to satisfy this requirement.

It is well established that "[t]he party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Bolger* v. *Youngs Drug Products Corp.,* 463 U. S. 60, 71, n. 20 (1983); *Fox,* 492 U. S., at 480. This burden is not satisfied by mere speculation or conjecture; rather, a gov-

ernmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree. See, *e. g.*, *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626, 648–649 (1985); *Bolger, supra,* at 73; *In re R. M. J.,* 455 U. S., at 205–206; *Central Hudson Gas & Electric Corp., supra,* at 569; *Friedman* v. *Rogers,* 440 U. S., at 13–15; *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85, 95 (1977). Without this requirement, a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.

The Board has not demonstrated that, as applied in the business context, the ban on CPA solicitation advances its asserted interests in any direct and material way. It presents no studies that suggest personal solicitation of prospective business clients by CPA's creates the dangers of fraud, overreaching, or compromised independence that the Board claims to fear. The record does not disclose any anecdotal evidence, either from Florida or another State, that validates the Board's suppositions. This is so even though 21 States place no specific restrictions of any kind on solicitation by CPA's, and only 3 States besides Florida have enacted a categorical ban. See 3 La. Admin. Code 46:XIX.507(D)(1)(c) (Supp. 1988); Minn. Admin. Code § 1100.6100 (1991); 22 Tex. Admin. Code § 501.44 (Supp. 1992). Not even Fane's own conduct suggests that the Board's concerns are justified. Cf. *Ohralik, supra,* at 467–468. The only suggestion that a ban on solicitation might help prevent fraud and overreaching or preserve CPA independence is the affidavit of Louis Dooner, which contains nothing more than a series of conclusory statements that add little if anything to the Board's original statement of its justifications.

The Board directs the Court's attention to a report on CPA solicitation prepared by the American Institute of Certified Public Accountants in 1981. See AICPA, Report of the Spe-

cial Committee on Solicitation (1981), App. 29. The Report contradicts, rather than strengthens, the Board's submissions. The AICPA Committee stated that it was "unaware of the existence of any empirical data supporting the theories that CPAs (a) are not independent of clients obtained by direct uninvited solicitation, or (b) do not maintain their independence in mental attitude toward those clients subjected to direct uninvited solicitation by another CPA." *Id.*, at 4, App. 38. Louis Dooner's suggestion that solicitation of new accounts signals the need for work and invites an improper approach from the client ignores the fact that most CPA firms desire new clients. The AICPA Report discloses no reason to suspect that CPA's who engage in personal solicitation are more desperate for work, or would be any more inclined to compromise their professional standards, than CPA's who do not solicit, or who solicit only by mail or advertisement. With respect to the prospect of harassment or overreaching by CPA's, the report again acknowledges an "absence of persuasive evidence that direct uninvited solicitation by CPAs is likely to lead to false or misleading claims or oppressive conduct." *Id.*, at 2, App. 35.

Other evidence concerning personal solicitation by CPA's also belies the Board's concerns. In contrast to the Board's anxiety over uninvited solicitation, the literature on the accounting profession suggests that the main dangers of compromised independence occur when a CPA firm is too dependent upon, or involved with, a longstanding client. See, *e. g.,* P. Cottell & T. Perlin, Accounting Ethics 39–40 (1990); G. Previts, The Scope of CPA Services: A Study of the Development of the Concept of Independence and the Profession's Role in Society 142 (1985); S. Rep. No. 95–34, pp. 50–52 (1977); General Accounting Office, CPA Audit Quality: Status of Actions Taken to Improve Auditing and Financial Reporting of Public Companies 36 (Mar. 1989) (GAO/AFMD–89–38). It appears from the literature that a business executive who wishes to obtain a favorable but unjustified audit opinion

from a CPA would be less likely to turn to a stranger who has solicited him than to pressure his existing CPA, with whom he has an ongoing, personal relation and over whom he may also have some financial leverage. See *id.*, at 34 ("A company using the threat of changing accountants—opinion shopping—to pressure its existing accounting firm to accept a less than desirable accounting treatment is one way independence is threatened"); Cottell & Perlin, *supra,* at 34 (noting that independence can be eroded if a client is served by a single auditor for a great length of time).

For similar reasons, we reject the Board's alternative argument that the solicitation ban is a reasonable restriction on the manner in which CPA's may communicate with prospective clients, rather than a direct regulation of the commercial speech itself. Assuming that a flat ban on commercial solicitation could be regarded as a content-neutral time, place, or manner restriction on speech, a proposition that is open to serious doubt, see, *e. g., Virginia State Bd. of Pharmacy,* 425 U. S., at 771, a challenged restriction of that type still must serve a substantial state interest in "a direct and effective way," *Ward* v. *Rock Against Racism,* 491 U. S. 781, 800 (1989). The State has identified certain interests in regulating solicitation in the accounting profession that are important and within its legitimate power, but the prohibitions here do not serve these purposes in a direct and material manner. Where a restriction on speech lacks this close and substantial relation to the governmental interests asserted, it cannot be, by definition, a reasonable time, place, or manner restriction.

## C

Relying on *Ohralik,* the Board seeks to justify its solicitation ban as a prophylactic rule. It acknowledges that Fane's solicitations may not involve any misconduct but argues that all personal solicitation by CPA's must be banned, because this contact most often occurs in private offices and is difficult to regulate or monitor.

We reject the Board's argument and hold that, as applied in this context, the solicitation ban cannot be justified as a prophylactic rule. *Ohralik* does not stand for the proposition that blanket bans on personal solicitation by all types of professionals are constitutional in all circumstances. Because "the distinctions, historical and functional, between professions, may require consideration of quite different factors," *Virginia State Bd. of Pharmacy, supra,* at 773, n. 25, the constitutionality of a ban on personal solicitation will depend upon the identity of the parties and the precise circumstances of the solicitation. Later cases have made this clear, explaining that *Ohralik*'s holding was narrow and depended upon certain "unique features of in-person solicitation by lawyers" that were present in the circumstances of that case. *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U. S., at 641; see also *Shapero* v. *Kentucky Bar Assn.,* 486 U. S. 466, 472 (1988).

*Ohralik* was a challenge to the application of Ohio's ban on attorney solicitation and held only that a State Bar "constitutionally may discipline a lawyer for soliciting clients in person, for pecuniary gain, under circumstances likely to pose dangers that the State has a right to prevent." *Ohralik,* 436 U. S., at 449. While *Ohralik* discusses the generic hazards of personal solicitation, see *id.,* at 464–466, the opinion made clear that a preventative rule was justified only in situations "inherently conducive to overreaching and other forms of misconduct." *Id.,* at 464; cf. *In re R. M. J.,* 455 U. S., at 203 (advertising may be banned outright only if it is actually or inherently misleading). The Court in *Ohralik* explained why the case before it met this standard:

> "[T]he potential for overreaching is significantly greater when a lawyer, a professional trained in the art of persuasion, personally solicits an unsophisticated, injured, or distressed lay person. Such an individual may place his trust in a lawyer, regardless of the latter's qualifications or the individual's actual need for legal rep-

resentation, simply in response to persuasion under circumstances conducive to uninformed acquiescence. Although it is argued that personal solicitation is valuable because it may apprise a victim of misfortune of his legal rights, the very plight of that person not only makes him more vulnerable to influence but also may make advice all the more intrusive. Thus, under these adverse conditions the overtures of an uninvited lawyer may distress the solicited individual simply because of their obtrusiveness and the invasion of the individual's privacy, even when no other harm materializes. Under such circumstances, it is not unreasonable for the State to presume that in-person solicitation by lawyers more often than not will be injurious to the person solicited." 436 U. S., at 465–466 (footnotes omitted).

The solicitation here poses none of the same dangers. Unlike a lawyer, a CPA is not "a professional trained in the art of persuasion." A CPA's training emphasizes independence and objectivity, not advocacy. See 1 AICPA Professional Standards AU § 220; 2 *id.*, ET § 55; H. Magill & G. Previts, CPA Professional Responsibilities: An Introduction 105–108 (1991). The typical client of a CPA is far less susceptible to manipulation than the young accident victim in *Ohralik*. Fane's prospective clients are sophisticated and experienced business executives who understand well the services that a CPA offers. See Affidavit of Scott Fane ¶¶ 5–7, 10(A), App. 10–11, 13. In general, the prospective client has an existing professional relation with an accountant and so has an independent basis for evaluating the claims of a new CPA seeking professional work. *Id.*, ¶ 6, App. 10–11.

The manner in which a CPA like Fane solicits business is conducive to rational and considered decisionmaking by the prospective client, in sharp contrast to the "uninformed acquiescence" to which the accident victims in *Ohralik* were prone. *Ohralik, supra,* at 465. While the clients in *Ohralik* were approached at a moment of high stress and

vulnerability, the clients Fane wishes to solicit meet him in their own offices at a time of their choosing. If they are unreceptive to his initial telephone solicitation, they need only terminate the call. Invasion of privacy is not a significant concern.

If a prospective client does decide to meet with Fane, there is no expectation or pressure to retain Fane on the spot; instead, he or she most often exercises caution, checking references and deliberating before deciding to hire a new CPA. See Affidavit of Scott Fane ¶ 10(C), App. 13–14. Because a CPA has access to a business firm's most sensitive financial records and internal documents, retaining a new accountant is not a casual decision. *Ibid.* The engagements Fane seeks are also long term in nature; to the extent he engages in unpleasant, high pressure sales tactics, he can impair rather than improve his chances of obtaining an engagement or establishing a satisfactory professional relation. The importance of repeat business and referrals gives the CPA a strong incentive to act in a responsible and decorous manner when soliciting business. In contrast with *Ohralik,* it cannot be said that under these circumstances, personal solicitation by CPA's "more often than not will be injurious to the person solicited." *Ohralik,* 436 U. S., at 466.

The Board's reliance on *Ohralik* is misplaced for yet another reason: The Board misunderstands what *Ohralik* meant when it approved the use of a prophylactic rule. *Id.,* at 464. The ban on attorney solicitation in *Ohralik* was prophylactic in the sense that it prohibited conduct conducive to fraud or overreaching at the outset, rather than punishing the misconduct after it occurred. But *Ohralik* in no way relieves the State of the obligation to demonstrate that it is regulating speech in order to address what is in fact a serious problem and that the preventative measure it proposes will contribute in a material way to solving that problem. See *ibid.* (describing the State's fear of harm from attorney solicitation as "well founded").

Were we to read *Ohralik* in the manner the Board proposes, the protection afforded commercial speech would be reduced almost to nothing; comprehensive bans on certain categories of commercial speech would be permitted as a matter of course. That would be inconsistent with the results reached in a number of our prior cases. See, *e. g.*, *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626 (1985); *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977); *Linmark Associates, Inc.* v. *Willingboro*, 431 U. S. 85 (1977). It would also be inconsistent with this Court's general approach to the use of preventative rules in the First Amendment context. "Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP* v. *Button*, 371 U. S. 415, 438 (1963) (citations omitted). Even under the First Amendment's somewhat more forgiving standards for restrictions on commercial speech, a State may not curb protected expression without advancing a substantial governmental interest. Here, the ends sought by the State are not advanced by the speech restriction, and legitimate commercial speech is suppressed. For this reason, the Board's rule infringes upon Fane's right to speak, as guaranteed by the Constitution.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE BLACKMUN, concurring.

I join the Court's opinion, just as I joined JUSTICE STEVENS' recent opinion for the Court in *Cincinnati* v. *Discovery Network, Inc.*, *ante*, p. 410, with the observation that I again disengage myself from any part thereof, or inference therefrom, that commercial speech that is free from fraud or duress or the advocacy of unlawful activity is entitled to only an "intermediate standard," see *ante*, at 767, of protection

under the First Amendment's proscription of any law abridging the freedom of speech.

JUSTICE O'CONNOR, dissenting.

I continue to believe that this Court took a wrong turn with *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977), and that it has compounded this error by finding increasingly unprofessional forms of attorney advertising to be protected speech. See *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626 (1985); *Shapero* v. *Kentucky Bar Assn.*, 486 U. S. 466 (1988); *Peel* v. *Attorney Registration and Disciplinary Comm'n of Ill.*, 496 U. S. 91 (1990) (plurality opinion). These cases consistently focus on whether the challenged advertisement directly harms the listener: whether it is false or misleading, or amounts to "overreaching, invasion of privacy, [or] the exercise of undue influence," *Shapero*, *supra*, at 475. This focus is too narrow. In my view, the States have the broader authority to prohibit commercial speech that, albeit not directly harmful to the listener, is inconsistent with the speaker's membership in a learned profession and therefore damaging to the profession and society at large. See *Zauderer*, *supra*, at 676–677 (O'CONNOR, J., concurring in part, concurring in judgment in part, and dissenting in part); *Shapero*, *supra*, at 488–491 (O'CONNOR, J., dissenting); *Peel*, *supra*, at 119 (O'CONNOR, J., dissenting). In particular, the States may prohibit certain "forms of competition usual in the business world," *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 792 (1975) (internal quotation marks omitted), on the grounds that pure profit seeking degrades the public-spirited culture of the profession and that a particular profit-seeking practice is inadequately justified in terms of consumer welfare or other social benefits. Commercialization has an incremental, indirect, yet profound effect on professional culture, as lawyers know all too well.

But even if I agreed that the States may target only professional speech that directly harms the listener, I still would dissent in this case. *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978), held that an attorney could be sanctioned for the in-person solicitation of two particularly vulnerable potential clients, because of the inherent risk under such circumstances that the attorney's speech would be directly harmful, and because a simple prohibition on fraud or overreaching would be difficult to enforce in the context of in-person solicitation. See *id.*, at 464–468. The result reached by the majority today cannot be squared with *Ohralik.*

Although *Ohralik* preceded *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 557 (1980), this Court has understood *Ohralik* to mean that a rule prohibiting in-person solicitation by attorneys would satisfy the *Central Hudson* test. See *Shapero, supra,* at 472. Such a rule would "directly advanc[e] the governmental interest [and would not be] more extensive than is necessary to serve that interest." *Central Hudson, supra,* at 566. A substantial fraction of in-person solicitations are inherently conducive to overreaching or otherwise harmful speech, and these potentially harmful solicitations cannot be singled out in advance (or so a reasonable legislator could believe).

I see no constitutional difference between a rule prohibiting in-person solicitation by attorneys, and a rule prohibiting in-person solicitation by certified public accountants (CPA's). The attorney's rhetorical power derives not only from his specific training in the art of persuasion, see *ante,* at 774–775, but more generally from his *professional expertise.* His certified status as an expert in a complex subject matter— the law—empowers the attorney to overawe inexpert clients. CPA's have an analogous power. The drafters of Fla. Admin. Code § 21A–24.002(2)(c) (1992) reasonably could

have envisioned circumstances analogous to those in *Ohralik,* where there is a substantial risk that the CPA will use his professional expertise to mislead or coerce a naive potential client.

Indeed, the majority scrupulously declines to question the validity of Florida's rule. The majority never analyzes the rule itself under *Central Hudson,* cf. *Posadas de Puerto Rico Associates* v. *Tourism Co. of Puerto Rico,* 478 U. S. 328, 340–344 (1986) (analyzing "facial" validity of law regulating commercial speech by employing *Central Hudson* test), but instead seeks to avoid this analysis by characterizing Fane's suit as an "as-applied" challenge. See *ante,* at 763, 767, 770, 771, 774. I am surprised that the majority has taken this approach without explaining or even articulating the underlying assumption: that a commercial speaker can claim First Amendment protection for particular instances of prohibited commercial speech, even where the prohibitory law satisfies *Central Hudson.* *Board of Trustees of State University of N. Y.* v. *Fox,* 492 U. S. 469 (1989), appears to say the opposite, see *id.,* at 476–486, and we recently granted certiorari in a case that poses precisely this issue, see *United States* v. *Edge Broadcasting Co.,* 506 U. S. 1032 (1992).

In any event, the instant case is *not* an "as-applied" challenge, in the sense that a speaker points to special features of his own speech as constitutionally protected from a valid law. Cf. *Zauderer, supra,* at 644. The majority obscures this point by stating that Florida's rule "cannot be sustained as applied to Fane's proposed speech," *ante,* at 767, and by paraphrasing Fane's affidavit at length to show that he does not propose to solicit vulnerable clients, *ante,* at 775–776. But I do not understand the relevance of that affidavit here, because the broad remedy granted by the District Court goes well beyond Fane's own speech.

> "Florida Administrative Code, §§ 21A–24.002(2) and (3), places an unconstitutional ban on protected commercial speech in violation of the first . . . amendmen[t].

> The Board of Accountancy and State are hereby enjoined from enforcing that regulation as it is applied to CPAs who seek clients through in-person, direct, uninvited solicitation in the business context." App. 88.

Even if the majority is correct that a law satisfying *Central Hudson* cannot be applied to harmless commercial speech, and that Fane's proposed speech will indeed be harmless, these two premises do not justify an injunction against the enforcement of the antisolicitation rule *to all CPA's*.

The majority also relies on the fact that petitioners were enjoined only from enforcing the rule in the "business context." See *ante*, at 763, 771. Yet this narrowing of focus, without more, does not salvage the District Court's remedy. I fail to see why § 21A–24.002(2)(c) should be valid overall, but not "in the business context." Small businesses constitute the vast majority of business establishments in the United States, see U. S. Dept. of Commerce, Statistical Abstract of the United States 526 (1992). The drafters of Florida's rule reasonably could have believed that the average small businessman is no more sophisticated than the average individual who is wealthy enough to hire a CPA for his personal affairs.

In short, I do not see how the result reached by the majority is consistent with the validity of § 21A–24.002(2)(c). In failing to state otherwise, the majority implies that the rule itself satisfies *Central Hudson*, and I agree, but on that precise grounds I would reverse the judgment of the Court of Appeals.