**Robert H. SPEER, Jr., Plaintiff,**

v.

**Zell MILLER and Michael Bowers, Defendants.**

**No. 1:92–cv–1094–RHH.**

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 10, 1994.

As Amended on Denial of Reconsideration Sept. 19, 1994.

Paul Christopher Munger, Atlanta, GA, for plaintiff.

Mark Howard Cohen and Stephanie B. Manis, Office of State Atty. Gen., Atlanta, GA, for defendants.

## ORDER

ROBERT H. HALL, District Judge.

This case is before the Court on Plaintiff's Motion for a Permanent Injunction[1] [2] and Defendants' Amended Motion to Dismiss [9], the Eleventh Circuit having vacated and remanded for reconsideration this Court's previous rulings on these motions. The Court held a reconsideration hearing on July 14, 1994, and now GRANTS Plaintiff's Motion for a Permanent Injunction and DENIES Defendants' Amended Motion to Dismiss. Accordingly, the Court PERMANENTLY ENJOINS Defendants from enforcing O.C.G.A. § 35–1–9.

## BACKGROUND

Plaintiff Robert H. Speer, Jr., is an attorney licensed to practice law in Georgia. On May 7, 1992, he filed suit against Defendants Zell Miller and Michael Bowers, the Governor and Attorney General of Georgia respectively, seeking a permanent injunction prohibiting Defendants from enforcing O.C.G.A.

1. Plaintiff originally moved this Court to issue a preliminary injunction. At the suggestion of the Court, and with both parties' consent, the Court has consolidated the preliminary and permanent injunction hearings and rules here on Plaintiff's entitlement to a permanent injunction.

2. In his original Complaint, Plaintiff also sought to enjoin Defendants from enforcing O.C.G.A. § 50–18–70(d). Plaintiff subsequently dismissed that aspect of his Complaint [25].

§ 35–1–9.[2] O.C.G.A. § 35–1–9 (hereinafter "the Georgia statute") provides:

(a) It shall be unlawful for any person to inspect or copy any records of a law enforcement agency to which the public has a right of access under paragraph (4) of subsection (a) of Code Section 50–18–72[3] for the purpose of obtaining the names and addresses of the victims of crimes or persons charged with crimes or persons involved in motor vehicle accidents or other information contained in such records for any commercial solicitation of such individuals or relatives of such individuals.

(b) The provisions of subsection (a) of this Code section shall not prohibit the publication of such information by any news media or the use of such information for any other lawful data collection or analysis purpose.

(c) Any person who violates any provision of subsection (a) of this Code section shall be guilty of a misdemeanor.

Plaintiff contends that this statute prevents him from gaining access to otherwise public records for use in soliciting clients. As a result, Plaintiff alleges, the statute violates his rights under the First and Fourteenth Amendments. In an Order dated September 25, 1992, this Court dismissed Plaintiff's first amendment claim for failure to state a claim upon which relief could be granted. *Speer v. Miller*, Civil Action No. 92–1094, slip op. p. 8 (N.D.Ga. September 25, 1992) (hereinafter "September Order") [10]. This Court, however, found that Plaintiff *had* stated a cognizable Fourteenth Amendment equal protection claim, but the Court declined to grant Plaintiff's motion for a preliminary injunction. *Id.* at pp. 9, 11.

In dismissing Plaintiff's First Amendment claim, the Court concluded:

3. O.C.G.A. § 50–18–72(a) provides: Public disclosure shall not be required for records that are ... (4) Records of law enforcement, prosecution, or regulatory agencies in any pending investigation or prosecution of criminal or unlawful activity, other than initial police arrest reports, accident reports, and incident reports; provided, however, that an investigation or prosecution shall no longer be deemed to be pending when all direct litigation involving said investigation and prosecution has become final or otherwise terminated.

Plaintiff has failed to allege that the statute at issue infringes on his right to engage in commercial speech. Plaintiff is free to engage in all the commercial speech he wishes. He is free to solicit all the clients he wants. He simply cannot force the government to provide him with the names of individuals (and other information) to whom he wishes to direct his commercial speech.

*Id.* at p. 8. In finding that Plaintiff had stated a cognizable equal protection claim, the Court accepted Plaintiff's allegation that "he is similarly situated to the news media which is allowed to use information for commercial purposes, and yet Plaintiff is forbidden to use the identical information for commercial purposes." *Id.* at 9 (internal punctuation omitted).

■ In denying Plaintiff's motion for a preliminary injunction, this Court first noted that Plaintiff's equal protection claim alleged that the Georgia statute violated a fundamental right, namely his first amendment right to freedom of speech. *Id.* at 10. Equal protection claims premised on the alleged violation of a fundamental right require that courts apply a strict scrutiny analysis and uphold the challenged statute only if it's means are suitably tailored to serving a compelling governmental interest. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Having dismissed Plaintiff's first amendment claim, the Court rejected Plaintiff's equal-protection-fundamental-right theory, finding instead that the statute is merely an economic regulation, requiring only that it bear a rational relationship to some legitimate state purpose. September Order, p. 10. *See also Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 488–89, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955) (setting forth the rational relationship test). The Court then concluded that Plaintiff was not likely to prevail on the merits of his equal protection claim and that the potential harm to Plaintiff from denying him an injunction did not necessarily outweigh the potential harm to Defendants from issuing the injunction. September Order, pp. 10–11.

On March 7, 1994, the Eleventh Circuit vacated this Court's September Order and remanded the matter for reconsideration. *Speer v. Miller,* 15 F.3d 1007, 1010–1011 (11th Cir.1994) (hereinafter *"Speer"*). The Eleventh Circuit provided the following analysis as explanation for its ruling:

A first amendment challenge is appropriate where a state prohibits the use of public records by one who wishes to engage in non-misleading, truthful commercial speech. *See Innovative Database Systems v. Morales,* 990 F.2d 217 (5th Cir. 1993). Advertisements by lawyers fall within this protected category. *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). Statutes that restrict commercial speech must directly advance a substantial government interest and the state bears the burden of justifying its restrictions. *Shapero v. Kentucky Bar Assn.,* 486 U.S. 466, 472, 108 S.Ct. 1916, 1921, 100 L.Ed.2d 475 (198[8]); *Fane v. Edenfield,* 945 F.2d 1514, 1518 (11th Cir.1991), *aff'd,* —— U.S. ——, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). A mere reading of this statute [O.C.G.A. § 35–1–9] indicates that it probably impinges upon Speer's commercial speech. Because of the procedures followed in the District Court, however, the state had no opportunity to develop its interest in the area.

*Speer,* 15 F.3d at 1010 (further commenting in a footnote that "[m]any of us might agree with the attempt by the Georgia legislature to upgrade the conduct of the state's lawyers but in today's world such is probably beyond its jurisdiction" and stating elsewhere in the Opinion that "it appears that Speer is likely to prevail on the merits...."). The matter is now back before this Court for reconsideration in keeping with the Eleventh Circuit's opinion.

## DISCUSSION

I. Plaintiff's First Amendment Claim.

A. *First Amendment Implication.*

This Court must first determine whether O.C.G.A. § 35–1–9 implicates the First Amendment as a restriction on commercial

speech. The Eleventh Circuit has made clear its opinion that it *does*. Each case cited in the above-quoted section of *Speer*'s analysis concerned a statute or professional regulation restricting the use or dissemination of information. In *Morales,* the Fifth Circuit affirmed a lower court's ruling that two Texas laws violated the First Amendment. 990 F.2d at 221, 222. The first law provided that "[a] person who has possession of crime victim or motor vehicle information ... obtained from a law enforcement agency may not use the information [to] solicit business...." *Id.* at 219. The second law empowered the Texas Board of Chiropractic Examiners to assess professional penalties to any chiropractor who "canvasses, drums, secures or solicits by phone, mail or in person patients [who] are vulnerable to undue influence." *Id.* In *Bates,* the Supreme Court held that an Arizona Bar disciplinary rule which provided that a lawyer "shall not publicize himself ... as a lawyer through newspaper or magazine advertisements, radio or televisions announcements ..." violated the First Amendment. 433 U.S. at 355, 379, 382, 383, 97 S.Ct. at 2694, 2706, 2708, 2709. In *Shapero,* the Supreme Court held that a Kentucky Supreme Court rule providing that a lawyer "may not solicit professional employment from a prospective client ..." violated the First Amendment. 486 U.S. at 470–71, 108 S.Ct. at 1920–21. Finally, in *Fane,* the Eleventh Circuit affirmed a lower court's holding that a Florida law subjecting to disciplinary action any certified public accountant who engages in "direct in-person, uninvited solicitation of a specific potential client" violated the First Amendment. 945 F.2d at 1516, 1520. *See also McHenry v. The Florida Bar,* 21 F.3d 1038, 1041, 1045 (11th Cir.1994) (finding that a Florida Bar Rule which provided "[a] lawyer shall not solicit professional employment from a prospective client ..." violated the First Amendment).

Although the instant case is broadly analogous to these cases, it is different in two significant ways. The statutes or rules in these other cases explicitly restricted *speech or use of information,* but not one of them restricted *access to information* prior to the information's use. In contrast, the Georgia statute restricts access to information but does not explicitly restrict speech or use of information. Also in contrast to the instant case, the governing authorities in these other cases appear to have conceded that the statutes or rules in question implicated the First Amendment. As a result, those courts did not discuss in any detail the question of First Amendment implication. These differences leave this Court wondering how cases disapproving direct restrictions on speech or use of information require the conclusion, without explanation or further evaluation, that statutes which appear to restrict only access to information are similarly unconstitutional.

In order to determine how the Georgia statute might implicate the First Amendment, which the Eleventh Circuit explicitly held that it did, we must evaluate the statute's possible interpretations. If we interpret the Georgia statute as merely denying access to a government commodity, it does not implicate the First Amendment, despite the fact that permitting access might facilitate the exercise of protected speech activities. *See Houchins v. KQED, Inc.* 438 U.S. 1, 9, 14, 98 S.Ct. 2588, 2594, 2596, 57 L.Ed.2d 553 (1978) ("There is no discernible basis for a constitutional duty to disclose, or for standards governing disclosure of or access to information."); *Calder v. I.R.S.,* 890 F.2d 781, 783–84 (5th Cir.1989) (finding that a statute restricting access to IRS information does not violate the First Amendment and commenting: "Quite simply, the right to speak and publish does not carry with it an unrestricted license to gather information."); *Capital Cities Media, Inc. v. Chester,* 797 F.2d 1164, *passim* (3d Cir.1986) (finding that a government agency could deny a newspaper access to government records despite the apparent effect the denial might have on the newspaper's exercise of its first amendment rights); *Minnis v. United States Dept. of Agriculture,* 737 F.2d 784, 786–88 (9th Cir. 1984) (finding that the Freedom of Information Act's privacy exemption permits the defendant to deny the plaintiff access to its list of people who applied for permits to travel on the Rogue River, which the plaintiff intended to use to solicit returning river travelers to his nearby lodge. Although the defendant

did not consider the plaintiff's intended commercial use of the information in denying his FOIA request, the court noted that the denial impaired the plaintiff's ability to exercise the commercial speech of soliciting customers), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985). *See also* Potter Stewart, *Or of the Press,* 26 Hastings L.J. 631, 636 (1975) ("There is no constitutional right to have access to particular government information, or to require openness from the bureaucracy. The public's interest in knowing about its government is protected by the guarantee of a Free Press, but the protection is indirect. The Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act."). These same cases suggest that interpreting the statute as punishing certain accessing acts (i.e., inspecting or copying government documents under certain circumstances) would also not place it within the First Amendment's reach.

Alternatively, we could interpret the statute as punishing the use of the accessed information (under the guise of punishing the prior act of accessing it). Such an interpretation is plausible because, under the statute, the operative act of accessing the information does not give rise to culpability until the actor utilizes, or attempts to utilize, the information in certain speech activities (i.e., soliciting business). In other words, it is the use to which the accessed information is put or is intended to be put that triggers the sanction on the act of accessing the information.

Defendants contend that the recent Supreme Court opinion in *Lyng v. Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America,* 485 U.S. 360, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988) (hereinafter *"United Automobile Workers"*), supports their argument that the state of Georgia can deny access to a desired government commodity, even if done in response to, or in a way which will affect, one's exercise of his first amendment rights. In *United Automobile Workers,* the Supreme Court upheld a federal law excluding from participation in the food stamp program any household of which a member is on strike. *Id.* at 363 n. 2, 364, 108 S.Ct. at 1188 n. 2, 1188. The plaintiff union challenged the law, arguing that it

violated union members' first amendment rights to freedom of speech and freedom of association (i.e., freedom of individuals to associate within the context of a union) because it acted to punish, and because it had the effect of frustrating, exercise of those rights. *Id.* at 364, 108 S.Ct. at 1188. The Supreme Court found that the law does not violate the First Amendment's guarantee of freedom of association because it does not "significantly" interfere with the exercise of that right, despite the fact that denying food stamps to striking workers may "exert[ ] pressure on them to abandon their union." *Id.* at 368, 108 S.Ct. at 1191. *See also id.* at 367 n. 5, 108 S.Ct. at 1190 n. 5 ("Exposing the members of an association to physical and economic reprisals or to civil liability merely because of their membership in that group poses a much greater danger to the exercise of associational freedoms than does the withdrawal of a government benefit based not on membership in an organization but merely for the duration of one activity that may be undertaken by that organization."). The Supreme Court also likened the law to one which declines to subsidize the exercise of a fundamental right to associate and to engage in speech and reiterated that such a law does not infringe that right. *Id.* at 368, 369, 108 S.Ct. at 1191, 1191.

Unlike the federal law in *United Automobile Workers,* the Georgia statute does not merely withdraw a government benefit; it imposes a criminal punishment. And although the Georgia statute professes to punish not the speech (i.e., the solicitation) but the act of accessing government records (analogous to the *United Automobile Workers* hypothetical presented in the preceding paragraph of punishing the act of striking as opposed to punishing the act of associating with others in a union, 485 U.S. at 367 n. 5, 108 S.Ct. at 1190 n. 5), the act of accessing the government records triggers enforcement only because of the speech use to which it is put. Thus, it is not only accessing that is forbidden, but accessing coupled with a certain kind of speech use that gives rise to the sanction. Such an interpretation could explain the Eleventh Circuit's finding that the Georgia statute implicates the First Amendment.

The Tenth Circuit has recently adopted a similar position. In the case of *Lanphere & Urbaniak v. Colorado,* 21 F.3d 1508 (10th Cir.1994), *reh'g denied,* Civil Action No. 93–1363 (10th Cir. July 1, 1994) (en banc), the Tenth Circuit found that the following Colorado statute implicates the First Amendment:

Access to records -denial by custodian- use of records to obtain information for solicitation. Records of official actions and criminal justice records and the names, addresses, telephone numbers, and other information in such records shall not be used by any person for the purpose of soliciting business for pecuniary gain. The official custodian shall deny any person access to records of official actions and criminal justice records unless such person signs a statement which affirms that such records shall not be used for the direct solicitation of business for pecuniary gain.

*Id.* at 1516 (emphasis added in accordance with the statute). The Tenth Circuit construed the plaintiff's claim as raising the question, "whether there is [in this case] an overriding constitutional right of access to government records." *Id.* at 1511. The Court answered the question by finding that:

Although criminal justice records themselves do not constitute speech, the Colorado Legislature has drawn a regulatory line based on the speech use of such records. [The statute in question] disallows the release of records to those wishing to use them for commercial speech, while allowing the release of the same records to those having a noncommercial purpose. Because commercial speech is protected under the First Amendment (though it is accorded lesser protection than 'core' First Amendment speech), and because such speech includes direct mail solicitation, what we have in the end is a content-based restriction on protected speech.

*Id.* at 1513 (citations omitted).[4]

Although the Tenth Circuit's reasoning does not fully explain the distinction between the Colorado statute and the restrictions at issue in, say, *United Automobile Workers,* this Court agrees with the Tenth and Eleventh Circuits' conclusions and finds that the Georgia statute implicates the First Amendment. Having so found, the Court must now determine whether the Georgia statute violates the First Amendment.

## B. Central Hudson Test.

The Supreme Court has established a test for determining whether a restriction on commercial speech violates the First Amendment.

In commercial speech cases, [ ] a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980). *See also Ibanez v. Florida Dept. of Business and Professional Regulation,* — U.S. —, —, 114 S.Ct. 2084, 2088, 129 L.Ed.2d 118 (1994) (citing *Central Hudson* for the proposition that "[c]ommercial speech that is not false, deceptive, or misleading can be restricted, but only if the State shows that the restriction directly and materially advances a substantial state interest in a manner no more extensive than necessary to serve that interest.").

### 1. Protected Expression.

Plaintiff insists that he will use the information contained in the law enforcement agency records for commercial speech which

---

**4.** The *Lanphere & Urbaniak* Court explicitly declined to construe the plaintiff's case as one of a government refusing to aid in certain speech rather than as one of a government obstructing speech. 21 F.3d at 1513 n. 2 (citing *Rust v. Sullivan,* 500 U.S. 173, 194, 111 S.Ct. 1759, 1773, 114 L.Ed.2d 233 (1991)).

is not false, deceptive or misleading. Defendants do not contest this assertion.

### 2. *Substantial Government Interest, Direct Advancement Thereof and Extensiveness of the Statute.*

As a matter of form, the substantial government interest prong and the direct advancement thereof prong of the *Central Hudson* test are distinct from one another. Thus, in addressing the substantial government interest prong, courts are merely to evaluate the asserted interest without measuring it against the means the state has undertaken allegedly to promote it. *See Central Hudson,* 447 U.S. at 568–69, 100 S.Ct. at 2352–53 (maintaining a narrow focus on the substantiality of the state's asserted interest). In practice, however, courts sometimes consider the statute or rule at issue in evaluating the genuineness of the state's proffered interest, thus equating genuineness with substantiality. *See Lanphere & Urbaniak,* 21 F.3d at 1514–15 (treating the Colorado statute's allegedly piecemeal approach to promoting the asserted interest as relevant to determining whether the asserted interest was substantial).

#### a. *Substantial Interest.*

Defendants assert three separate state interests, each of which they contend is substantial: "(1) protect[ing] the privacy of those charged with criminal offenses and those involved in accidents, (2) protect[ing] the public against unnecessary insurance abuses and (3) minimiz[ing] the opportunity for fraud and misrepresentation." Defendants' Brief in Opposition to Plaintiff's Motion for Preliminary and Permanent Injunctive Relief, pp. 17–18[33]. This Court is willing to accept Defendants' proffered interests as being substantial.

#### b. *Direct Advancement and Extensiveness of the Statute.*

■ "It is well established that '[t]he party seeking to uphold a restriction on commercial speech carries the burden of justifying it.'" *Edenfield v. Fane,* —— U.S. ——, ——, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993) (quoting *Bolger v. Youngs Drug Products*

*Corp.,* 463 U.S. 60, 71, n. 20, 103 S.Ct. 2875, 2883, n. 20, 77 L.Ed.2d 469 (1983)). Accordingly, the State must show that the means it chooses to advance its interest advance that interest in a "direct and material way." *Edenfield,* —— U.S. at ——, 113 S.Ct. at 1798. "'[M]ere speculation or conjecture' will not suffice; rather the State 'must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.'" *Ibanez,* —— U.S. at ——, 114 S.Ct. at 2089 (quoting *Edenfield,* —— U.S. at ——, 113 S.Ct. at 1800). Furthermore, the State has the burden of showing that "more limited speech regulation would be ineffective...." *Central Hudson,* 447 U.S. at 571, 100 S.Ct. at 2354. This is not a "least restrictive means test," but, rather, a requirement that the regulation be "'narrowly tailored' to serve a significant governmental interest." *Board of Trustees v. Fox,* 492 U.S. 469, 476–81, 109 S.Ct. 3028, 3032–35, 106 L.Ed.2d 388 (1989); *Lanphere & Urbaniak,* 21 F.3d at 1515.

Defendants have explored their second and third asserted interests only fleetingly before this Court. This exploration includes cursory statements in their briefs and at the reconsideration hearing, and affidavits from three people familiar with insurance fraud in the state of Georgia. In the affidavits, the affiants state that people practicing insurance fraud acquire from law enforcement records the names of accident victims, contact those victims by phone and tell the victims that, notwithstanding a lack of injury from the accident, they can recover money from insurance companies if they follow the caller's instructions. [35]. In their briefs and in their verbal argument at the reconsideration hearing, Defendants offered only conclusory claims that the Georgia statute directly advances the State's interests and is sufficiently "narrowly tailored." Defendants' Brief at pp. 19–20.

Even if the Georgia statute directly advances Defendants' second and third asserted interests, the Court finds that Defendants have not carried their burden of showing that the resulting restriction on commercial speech is narrowly tailored to serve the State's interests. In their brief, Defendants'

only discussion of *Central Hudson's* fourth prong is their statement that "[t]he decision by the Georgia General Assembly not to require that law enforcement assist those individuals who wish to solicit clients by providing a mailing list is just such a narrowly tailored restriction." *Id.* at 20. Defendants do not mention or refute possibly less restrictive means of serving the State's interests. Because the Georgia statute restricts access not only by corrupt attorneys but also by honest attorneys, honest health care providers and other honest solicitors, there exists a need to justify the broad scope of the restriction and to demonstrate that less-restrictive means would not have sufficed. Because Defendants offered only conclusory statements that the Georgia statute was narrowly tailored, the Court must find that Defendants' second and third asserted interests must fail the fourth prong of the *Central Hudson* test. *But cf. Lanphere & Urbaniak,* 21 F.3d at 1515–16 (finding that the Colorado statute was not more extensive than necessary to serve the state's interest in protecting individuals' privacy).[5]

■ The State's primary assertion, and the one most thoroughly addressed by other courts, is that the State has a substantial interest in protecting the privacy of those whose names appear in the affected law enforcement records. However, courts have found that statutes restricting use of government information do not protect a person's privacy against significant invasion because in such a situation the person's privacy has already been infringed by the initial access to the information. *See, e.g., Shapero v. Kentucky Bar Assoc.,* 486 U.S. 466, 476, 108 S.Ct. 1916, 1923, 100 L.Ed.2d 475 (1988) ("the [privacy] invasion, if any, occurs when the lawyer discovers the recipient's legal affairs, not when he confronts the recipient with the discovery."); *McHenry v. The Florida Bar,*

21 F.3d 1038, 1044 (11th Cir.1994) ("[T]he invasion of the potential client's privacy in this case occurs when the lawyer learns of the accident or tragedy with which the potential client is involved. In many cases, this invasion of privacy will involve no more than reading the newspaper."). Following the necessary implications of *Shapero's* reasoning, the Tenth Circuit found in *Lanphere & Urbaniak* that statutes restricting access to information *do* promote people's privacy interests. 21 F.3d at 1514 (describing *Shapero's* finding and stating that "[t]he case at issue involves just that sort of invasion.").

In vacating this Court's September Order, the Eleventh Circuit stated: "We note that any privacy arguments the state asserts are disingenuous in light of the fact that the statute carves out an exception for the media to place any information they obtain on the front page of any newspaper in Georgia." *Speer,* 15 F.3d at 1011 n. 7. This statement is in conflict with the Tenth Circuit's finding that the Colorado statute banning lawyers but not the media from accessing certain government records advanced a substantial government interest in protecting the privacy of the people listed in the protected government records. *Lanphere & Urbaniak,* 21 F.3d at 1514.[6] This Court finds that the Eleventh Circuit's belief is more persuasive.

The Tenth Circuit explained its finding as follows:

> Plaintiffs contend that the State's asserted privacy interest is only chimerical because the identity of those charged may be available through other sources such as local newspapers. However, even if the information is available to some degree through other sources, the state's interest in not aiding in the dissemination of the information for commercial purposes remains. We presume that plaintiffs would

---

5. The State elliptically asserts a substantial interest in not being required to assist in the dissemination of government information for commercial purposes, Defendants' Brief, pp. 19–20, but, simultaneously conflates that asserted interest with the three asserted interests discussed above. *Compare Lanphere & Urbaniak,* 21 F.3d at 1514. Even if Defendants had asserted this fourth interest as an independent one, the Court is dubious that such an interest would be considered "sub-

stantial" enough to permit restrictions on commercial speech.

6. The fact that the Georgia statute affirmatively exempts the media while the Colorado statute exempts the media only by implication (i.e., by prohibiting access only to those intending to use the information "for the purpose of soliciting business for pecuniary gain") is irrelevant.

not be involved in this litigation if the information they seek is so widely available that the privacy of the accused is no longer at issue. Thus, in this case we agree with the State that privacy considerations constitute a substantial interest.

*Lanphere & Urbaniak,* 21 F.3d at 1514. This Court disagrees with the Tenth Circuit's decision. This Court believes that the narrow and selective manner in which the Georgia statute attempts to further the asserted interest of protecting people's privacy betrays the statute's true focus and its inability to serve the state's asserted interest. The State does not restrict all (or probably even most) possible invasions of a person's privacy. Anyone may access the records in question so long as they do not do so with an eye towards using the information for certain types of commercial solicitations. The media may peruse and report the records, academicians may employ them in their research, statisticians may gather their contents for inclusion in their computations, inventive entrepreneurs may use their contents for the commercial solicitation of individuals neither named nor related to persons named therein, curiosity seekers may browse through them in search of titillation, or personal enemies may even extract information from them for diabolical (yet otherwise lawful) purposes. Only entities intending to use the names and addresses of those mentioned therein to solicit those people or their relatives for commercial purposes are denied access. The restriction's exceedingly narrow scope betrays it as a statute designed not to protect privacy but, instead, to prevent solicitous practices. And as *Shapero* teaches, a person's privacy is not infringed by the solicitation, but by the solicitor's discovery of the information that leads to the solicitation.

Accordingly, the Court finds that the Georgia statute does not directly advance the state's asserted interest because it advances that interest hardly at all and because it attempts to protect those named in the records primarily by preventing solicitations rather than by preventing significant access. Though it is arguable that the statute "directly" advances the state's substantial interest in protecting people's privacy because it prevents "some" access to government rec-

ords, it is this Court's belief that the "direct" effect of which the Supreme Court speaks does not include an effect so riddled with exceptions that the statute's ability to advance the asserted interest is anemic and betrays a true alternative purpose. *Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2350 ("First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose."). Accordingly, the Court finds that O.C.G.A. § 35–1–9 violates the First Amendment.

## II. *Equal Protection.*

Because the Court has found that O.C.G.A. § 35–1–9 violates the First Amendment, Plaintiff is entitled to all of the injunctive relief which he seeks. Accordingly, the Court finds that it need not address Plaintiff's Equal Protection claim.

## CONCLUSION

The Court GRANTS Plaintiff's Motion for a Permanent Injunction [2] and DENIES Defendants' Amended Motion to Dismiss [9]. The Court also PERMANENTLY ENJOINS Defendants from enforcing O.C.G.A. § 35–1–9.

So ORDERED.

## ORDER ON DEFENDANTS' MOTION FOR RECONSIDERATION OR CLARIFICATION

This case is before the Court on Defendants' Motion for Reconsideration, or in the alternative, for Clarification [39]. After careful consideration, the Court DENIES Defendants' motion. The Court also orders that its Order of August 10, 1994, be amended in the following regards:

[Editor's Note: Amendments have been incorporated into Order of August 10, 1994.]

## CONCLUSION

The Court DENIES Defendants' Motion for Reconsideration, or in the alternative, for Clarification [39] and ORDERS that its Or-

der of August 10, 1994, be amended as detailed above.

SO ORDERED.