United States Court of Appeals,

Eleventh Circuit.

No. 95-4070.

James P. SCIARRINO, an individual, d/b/a Clancy's Gourmet Pizza, Plaintiff-Appellant,

Wade Ferrel, an individual, Plaintiff,

v.

CITY OF KEY WEST, FLORIDA, a Florida Municipal Corporation, Defendant-Appellee.

May 16, 1996.

Appeal from the United States District Court for the Southern District of Florida. (No. 93-10031-CIV), James Lawrence King, Judge.

Before EDMONDSON and BIRCH, Circuit Judges, and FOREMAN[*], Senior District Judge.

EDMONDSON, Circuit Judge:

This case involves the regulation of commercial speech. In Key West's historic district, businesses used to seek customers by employing "barkers" to distribute handbills to pedestrians and to engage in face-to-face advertising. The city labelled the barking activities of these businesses "off-premises canvassing" ("OPC") and banned such conduct in specified areas: on public beaches, on Mallory Dock, and in public parking lots. *See* Key West, Fla., Code § 94.05. Also, OPC activity was significantly restricted, but not banned, on five historic streets heavily trafficked by pedestrians. *See id.* § 94.06. In addition, the city established a permitting system for OPC barkers who sought to work on public lands. For the permit, barkers apply by filling out an application, listing the

_____

[*]Honorable James L. Foreman, Senior U.S. District Judge for the Southern District of Illinois, sitting by designation.

business employer, and proving citizenship or work eligibility. *Id.* § 94.03.

The city's stated aims in passing the Ordinance were reducing litter, sidewalk congestion, and invasions of pedestrians' privacy. The Ordinance was challenged on First Amendment and state law grounds by Plaintiff Sciarrino, owner of Clancy's Gourmet Pizza, which is just off one of the busy streets on which OPC activity is now restricted; Clancy's engages in prohibited OPC activity. Sciarrino sought damages and permanent injunctive relief preventing enforcement of the Ordinance. After a bench trial, the judge ruled in favor of the city on the First Amendment and pendent state claims. We affirm the judgment.

I.

The Supreme Court has held that a state law drawing a distinction between commercial and non-commercial speech, as does the OPC ban, is not a mere time, place, and manner restriction. *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 430, 113 S.Ct. 1505, 1517, 123 L.Ed.2d 99 (1993). Therefore, the statute at issue must be judged against the Court's jurisprudence on restrictions on commercial speech.

In *Rubin v. Coors Brewing Co.,* --- U.S. ----, ----, 115 S.Ct. 1585, 1589, 131 L.Ed.2d 532 (1995), the Court stressed that

> the free flow of commercial information is "indispensable to the proper allocation of resources in a free enterprise system' because it informs the numerous private decisions that drive the system. Indeed ... a "particular consumer's interest in the free flow of commercial information ... may be as keen, if not keener by far, than his interest in the day's most urgent political debate.'

*Id.* (citations and alteration omitted).

Still, the Court has recognized the "common-sense distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *See Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 455-56, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978) (citation and internal quotation marks omitted). So, the constitution in reality grants "less protection to commercial speech than to other constitutionally safeguarded forms of expression." *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 64-65, 103 S.Ct. 2875, 2879, 77 L.Ed.2d 469 (1983) (citing *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 562-63, 100 S.Ct. 2343, 2349-50, 65 L.Ed.2d 341 (1980)).

Thus, in *Central Hudson,* the Court set out a four-part test to determine the constitutionality of restrictions on commercial speech. Pursuant to that test, the court must first determine that the speech is not misleading and concerns lawful activity. 447 U.S. at 563-64, 100 S.Ct. at 2350. If so, the First Amendment applies; and the government must prove that it has a substantial interest in its stated basis for the statute, that the regulation directly advances that interest, and that the regulation is narrowly drawn to avoid unduly burdening speech. *Id.* The party arguing the restriction's validity has the ultimate burden of justifying it. *Edenfield v. Fane,* 507 U.S. 761, 770, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993).

Here, the state has conceded that the prohibited OPC activity is not misleading and concerns lawful activity. We discuss each remaining element of the *Central Hudson* framework individually.

II.

A.

To find a "substantial interest," a court must conclude both that the interest advanced by the state is legitimate in theory, *and* that that interest is in remedying a problem that exists in fact (or probably would exist, but for the challenged legislation). In *Coors Brewing,* --- U.S. at ----, 115 S.Ct. at 1591, the government sought to justify the legislation by asserting the federal government's interest in "facilitat[ing]" state efforts to regulate alcohol. The Court rejected this asserted interest:

> We conclude that the Government's interest in preserving state authority is not sufficiently substantial to meet the requirements of *Central Hudson.* Even if the Federal Government possessed the broad authority to facilitate state powers, in this case the Government has offered nothing that suggests that States are in need of federal assistance.

*Id.* *See also Edenfield,* 507 U.S. at 768, 113 S.Ct. at 1798-99 (noting that courts should not ignore factual indications that state has obscured its real reason for regulating).

Here, however, the County has asserted valid goals, and the record supports the State's assurance that the stated problems are the actual ones sought to be redressed. Again, the state's asserted interests are preventing the harassment of pedestrians by barkers; reducing pedestrian traffic; and reducing litter. The Supreme Court has explicitly concluded that preventing vexation or harassment of the listener constitutes a legitimate state interest. *See Edenfield,* 507 U.S. at 769, 113 S.Ct. at 1799 (citing *Ohralik,* 436 U.S. at 462, 98 S.Ct. at 1921). And, we have concluded that preserving aesthetics is a valid interest. *See Supersign of Boca Raton v. City of Ft. Lauderdale,* 766 F.2d 1528, 1530 (11th

Cir.1985) ("The objectives served by the ordinance, traffic regulation and aesthetic improvement, undoubtedly qualify as substantial governmental interests."). The state's interest here is in preserving aesthetics through the reduction of litter.

At trial, the city elicited the testimony of various witnesses to establish that these harms were sufficiently real and that the city was sufficiently appraised of them; and this testimony was properly credited by the district court. Witnesses described the frequency of harassment[1] and the litter problems[2] associated with the OPC activity. (The City also introduced a thirty minute

---

[1] Key West's City Attorney, Sadele Virginia Stones, related the testimony—received at public hearings held by the city—about the harassment and delay associated with OPC encounters. She testified to her observation that barkers would congregate in particular areas, resulting in increased congestion and also in altercations among barkers.

> Captain McNeill of the Key West Police Department testified that before the Ordinance's passage, walking in the historic district

> > became such a hassle. You couldn't walk but part of a block until someone would be blocking you and handing you a flyer ... trying to hustle you to some business or another.... [I]f I was out in uniform we started to get a lot of complaints from tourists and business people.

> Virginia Panico, Executive Vice President of the Key West Chamber of Commerce, testified that her office received "hundreds" of complaints from businesses upset with the OPC activity. In addition, George Cooper, the city manager for the City of Key West, testified that one walking on Duval Street in the evening could expect to be approached several times by the barkers and that the barkers were "very irritable." He estimated that his office received thirty phone calls about off-premises canvassing activity.

[2] Virginia Panico described having to clean up the volume of menus and handbills left on the street and ledge outside the Chamber of Commerce building. Mr. Cooper, the city manager, also testified that he personally observed pedestrians throwing handbills on the streets on several occasions.

videotape depicting the situation the Ordinance was designed to remedy.)  Therefore, we are satisfied that the County has articulated a substantial interest under *Central Hudson*.[3]

## B.

Restrictions on commercial speech must not only address a valid problem, but must also contribute effectively to the solution—this is the "direct advancement" element of the *Central Hudson* test.  The focus in this stage of our study is on whether the evidence supports the idea that the regulation will actually work.  *See Edenfield,* 507 U.S. at 771, 113 S.Ct. at 1800 (party seeking to justify commercial speech restriction must prove that "the harms it recites are real and that its restriction will in fact alleviate them to a material degree");  *Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2350 ("[T]he regulation may not be sustained if it provides only ineffective or remote support for the government's purpose.").

The party defending the regulation must present some concrete indications that the regulation will have the intended effect. *E.g., Edenfield,* 507 U.S. at 771, 113 S.Ct. at 1800 (holding no

---

[3]We are not unmindful of Appellant's suggestion that the actual reason for the regulation was anti-competitive pressure—fear among owners of Duval Street businesses of competition from the businesses engaged in OPC activity.  *Cf. Edenfield,* 507 U.S. at 768, 113 S.Ct. at 1798-99 (courts should question whether the asserted justification for regulating is the real one).  But, the record indicates that the problem stemmed at least in part from OPC activity by businesses not directly competing with the complaining businesses.  For example, Virginia Panico testified that time-share resorts and glass-bottom boat companies were sources of litter and complaints;  and Mr. Cooper concurs that the initial source of the problem was time share companies, not restaurants.  These businesses would appear to be businesses not directly in competition with storefront owners on Duval Street.

material advancement where state "presents no studies" showing likely success of regulation, and where record "does not disclose any anecdotal evidence" to validate the government's suppositions regarding effectiveness); *Florida Bar v. Went For It, Inc.,* --- U.S. ----, ----, 115 S.Ct. 2371, 2377, 132 L.Ed.2d 541 (1995) (distinguishing *Edenfield,* because Florida Bar Association presented extensive statistical analyses); *Don's Porta Signs, Inc. v. City of Clearwater,* 829 F.2d 1051, 1053 n. 8 (11th Cir.1987) (upholding ban on display of portable signs based on deposition testimony and photographs in record "confirming an unsightly visual cluster") (record citation omitted).[4]

The issue before us is thus whether, in our independent estimation, the design of the statute and the early evidence about its impact indicate the regulatory scheme will achieve its goals. We conclude that the City presented sufficient evidence to support the district court's conclusion that the statute will advance its

---

[4]In the set of cases where the regulatory scheme is self-evidently destined to succeed or fail, the Court has passed on the constitutionality of the speech restrictions without extensive examination of the available evidence. *Compare Posados de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 343-42, 106 S.Ct. 2968, 2977, 92 L.Ed.2d 266 (1986) (evident on face of regulatory scheme that it will work) *with Coors Brewing,* --- U.S. at ----, 115 S.Ct. at 1592 (evident on face of scheme that it will not work).

Here, it is far from self-evident whether the regulation will fail or succeed in its goals. Therefore, the determination of this case depends on our fact-intensive record analysis. *See generally Don's Porta Signs,* 829 F.2d at 1053 n. 9 ("In cases involving first amendment claims, an appellate court must make an independent examination of the whole record."); *see also id.* (clearly erroneous standard does not apply to determinations of whether regulation directly advances government interest in First Amendment cases).

goals.  In particular, the City introduced extensive anecdotal evidence that the Ordinance reduced the number of instances of pedestrian congestion and harassment [5] in the City's historic district.

The district court ultimately concluded that the Ordinance directly advanced all three of the city's asserted interests.  But, the court indicated that the Ordinance had only a "tangible, if modest" impact on sidewalk congestion in the historic district.[6] And, though the district court found, based on City Manager Cooper's testimony, an appreciable reduction in litter after the Ordinance passed, we find Cooper's testimony to be devoid of a statement to that effect.  Nonetheless, the statute still survives constitutional scrutiny, because the Supreme Court has indicated that direct advancement of even one substantial interest is

---

[5]Ms. Panico of the Chamber of Commerce estimated that the number of barkers by her office in Mallory Square dropped to "three to five" after the ordinance, from their pre-ordinance levels of "a minimum of fifteen to maybe a maximum of thirty." She also testified to "marked improvement" in pedestrian traffic at certain intersections.  George Cooper, the city manager, testified that the volume of complaints about pedestrian harassment "was reduced," although "it hasn't been eliminated entirely."  And, significantly, Capt. McNeill stated that as business owners came into compliance with the ordinance, the number of complaints about OPC harassment dropped off sharply. He also testified that he personally witnessed a marked decrease in the aggressiveness of the barkers as they came into compliance.  In addition, Ms. Stones, the former City Attorney, testified that following enactment, "complaints from the public [about OPC activity] were substantially reduced if not eliminated."

[6]In view of the testimony cited above, we think the record supports an inference that pedestrian congestion was reduced considerably.  And if there were contrary indications, they seem to be attributable to the increase, recounted by Captain McNeill, in the overall level of visitors to Key West over the last several years.

sufficient to preserve a statute. *See Florida Bar v. Went For It, Inc.,* --- U.S. ----, ---- n. 1, 115 S.Ct. 2371, 2376 n. 1, 132 L.Ed.2d 541. From our independent examination of the record, we conclude that Key West has satisfactorily established that the Ordinance directly advances the substantial interests of reducing pedestrian congestion and reducing harassment of pedestrians.[7]

C.

---

[7]And, we reject the "underbreadth" strains of the Appellant's argument. The Supreme Court has conclusively indicated that a regulation may "directly advance" its asserted ends, though it strikes at less than the entire problem. For example, in *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (plurality opinion), the Court noted the statute was effective in fact and concluded simply that "[t]his [effectiveness] is not altered by the fact that the ordinance is underinclusive because it permits onsite advertising [while prohibiting offsite advertising]." 453 U.S. at 511, 101 S.Ct. at 2894.

Thus, we cannot accept Appellant's argument that because there are other sources of congestion, harassment, and litter, "the ban on the distribution of written material "in connection with a business' is not a reasonable fit between the goal of preventing litter and the means used to accomplish that goal." And, *Cincinnati v. Discovery Network,* 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), is not to the contrary. That case overturned a narrow ban on commercial newsracks, where the majority of the city's newsracks were noncommercial; but the Court relied not on the statute's underbreadth *per se* so much as on the irrationality of the content discrimination between commercial and noncommercial speech. Rejecting Cincinnati's explanation for the restriction's narrow breadth, the Court wrote that "the city's argument attaches more importance to the distinction between commercial and noncommercial speech than our cases warrant and seriously underestimates the value of commercial speech." 507 U.S. at 419, 113 S.Ct. at 1511.

Here, there has been no commensurate showing of irrationality in banning the OPC activity of businesses only (there has been no showing that non-business OPC activity existed). Thus, Appellant's argument, that the ordinance is invalid because it fails to address the preponderance of the underlying problem, is without merit.

The last element of the *Central Hudson* analysis inquires whether the statute reaches farther than is necessary. We conclude it does not.

The issue is whether the City has successfully "demonstrated that its interest ... cannot be protected adequately by more limited regulation of appellant's commercial expression." *Central Hudson,* 447 U.S. at 570, 100 S.Ct. at 2354. This standard does not require the city to employ the "least restrictive means" imaginable. *See Board of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). There, the Supreme Court "focus[ed] upon this specific issue for the first time," 492 U.S. at 477, 109 S.Ct. at 3033, and concluded that commercial speech protection demands "not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective." 492 U.S. at 480, 109 S.Ct. at 3035.

The burden to justify the extent of the restrictions nonetheless remains with the would-be regulator. *Id.* Here, we conclude the state has carried its burden of showing the restrictions to be narrowly tailored. The record evidences an absence of the "numerous and obvious less-burdensome alternatives to the restriction on commercial speech," *Discovery Network,* 507 U.S. at 417 n. 13, 113 S.Ct. at 1510 n. 13, which might require invalidation on this ground. Instead, the record evidences a careful effort on the part of the City to draw a balance between the commercial speech rights of the proprietors and the problems

the Ordinance addresses.[8]

### III.

Appellants also contend that the Ordinance is invalid under Fla.Stat. § 166.0443, which prohibits municipalities (not employers) from requiring the "registration ... of any individual engaged in ... a specific type of category of employment" and also precludes municipalities from requiring "the carrying of an identification card as a result of such registration." We agree with the district court's conclusion that the Ordinance does not violate the Florida statute.

The district court read the statute as not applicable here, because the Ordinance requires registration of barkers based on the location of their canvassing activity. That is, the Ordinance requires registration based on the place, and not the "specific type or category" of the employment. This conclusion was confirmed by the fact that no permit or registration is required for barking activities other than in the locations specified in the Ordinance.

Discounting the accuracy of the district judge's conclusion that the statute does not apply, we agree that the Ordinance

---

[8]Mr. Cooper, the city manager, testified that the city tried to broker "administrative" arrangements or informal "agreements" with businesses, but encountered frequent collective-action problems: "[An] organization would say, well, if they are not going to do it [then] I won't either.... Everyone seemed to say, if there is not going to be a formal rule about this we will do what we want to." Capt. McNeill's testimony also suggests that informal arrangements failed because the sentiment among businesspeople refraining from OPC activity was, "if all these people are going to do this I might have to do this to stay in business." The failure of these more limited attempts at redress demonstrates that the legislative measures enacted by the city are not so unduly burdensome as to offend *Central Hudson.* And, as the district court noted, the city stopped short of enacting an outright ban on OPC activity throughout the city.

survives anyway because the terms of the savings clause contained in the statute are met:  (1) Appellant does not contend the Ordinance is "preempted to the state or ... otherwise prohibited by law;"  (2) it is a valid exercise of police power;  (3) it is narrowly tailored, as described above;  and (4) it does not unfairly discriminate against a class of persons.  *Id.* § 166.0443(1)a-d.  Therefore, the district court correctly concluded the statute does not prohibit enforcement of the Ordinance.

AFFIRMED.