**Richard A. BORGNER, D.D.S., et al., Plaintiffs,**

v.

**Robert G. BROOKS, M.D., in his Official Capacity as Secretary, Department of Health, et al., Defendants.**

No. 4:99CV211–WS.

United States District Court, N.D. Florida, Tallahassee Division.

March 21, 2001.

Marilyn Josephine Marshall, Marilyn J Marshall PA, Tallahassee, FL, Frank R Recker, Frank R Recker & Assoc, Marco Island, FL, for Richard A Borgner, American Academy of Implant Dentistry, plaintiffs.

Robert Peter Daniti, Department of Health, State of Florida, Tallahassee, FL, for Robert G Brooks, Gloria Crawford–Henderson, defendants.

Barry Richard, Greenberg Traurig Hoffman, Lipoff Rosen & Quentel, Tallahassee, FL, for Florida Board of Dentistry, Solomon G. Brotman, Peter A. Keller, Faustino Garcia, Phil J. Levine, Charles L. Ross, Edward R. Scott, II, Carol E. Williamson, Helen Ann Douglas, Irene J. Stavros, Hilda H. Genco, Patsey J. Powers, defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

STAFFORD, Senior District Judge

In 1997, Dr. Richard A. Borgner ("Dr.Borgner") and the American Academy of Implant Dentistry ("AAID") filed an action in this court, case number 4:97cv93–WS, challenging a 1996 Florida statute that prohibited Florida licensed dentists from advertising membership in, or specialty recognition by, organizations not recognized by the American Dental Association ("ADA"). Fla.Stat. § 466.0282

(1996). That lawsuit ended when this court declared the challenged 1996 law unconstitutional to the extent it prohibited Dr. Borgner from advertising his membership and credentialed status in non-ADA-recognized organization. *See Borgner v. Cook*, 33 F.Supp.2d 1327 (N.D.Fla.1998).

Dr. Borgner and the AAID (collectively, "Plaintiffs") have now returned to this court to mount a constitutional challenge to the revised statute, section 466.0282, enacted by the Florida Legislature in 1999.[1] Plaintiffs contend that the revised statute, like the earlier statute, infringes upon their First Amendment right to freedom of commercial speech.

Before the court at this time are the parties' cross-motions for summary judgment (docs. 59, 62 & 82). Responses to the motions have been filed, and the parties have been advised that the motions would be taken under advisement as of a date certain.

## I.

Dr. Borgner is a licensed dentist who practices general dentistry with an emphasis in implant dentistry in St. Petersburg, Florida. Any dentist with a general license to practice as a dentist may perform implant dentistry in Florida. No special training or education beyond that required for the license to practice as a dentist is required.

The AAID is a national dental organization whose member dentists may earn credentials—specifically, Associate Fellow and Fellow—in the field of implant dentistry. The requirements for the Associate Fellow credential include: (1) completion of at least three hundred (300) hours of continuing education in implant dentistry, including at least one hundred fifty (150) hours of sciences related to implant dentistry and one hundred fifty (150) hours of clinical implant education; (2) a passing score on a written examination; and (3) successful completion of an oral/clinical treatment case examination. Some of the requirements for the Fellow credential include: (1) five or more years of experience in the practice of implant dentistry; (2) completion of one hundred (100) hours of continuing education in implant dentistry in addition to the thee hundred (300) hours required for Associate Fellow status; (3) completion of dental implant treatment of at least fifty (50) cases; (4) successful completion of an oral examination; and (5) satisfactory presentation of ten cases to the AAID's Admissions and Credentials Board. The AAID has approximately twenty-two hundred (2200) members, roughly five hundred fifty (550) of whom have earned the credential Associate Fellow and/or Fellow.

The AAID sponsors a certifying board, the ABOI/ID, which issues the Diplomate, or Board-Certified, credential to dentists who receive a passing score on the ABOI/ID's certification examination and who fulfill certain educational and experiential requirements. Since the ABOI/ID first began issuing its credentials in 1989, approximately 200 dentists in the United States have earned the ABOI/ID's Diplomate or Board Certified credential.

Dr. Borgner is a member and "Fellow" of the AAID. He is also a "Diplomate" of the American Board of Oral Implantology/Implant Dentistry ("ABOI/ID"). Dr. Borgner has advertised in the past, and wants to continue advertising in the future, both his membership in the AAID as well as his Fellow and Diplomate credentials.

---

1. Defendants were represented by the Florida Attorney General's office in the earlier case. On July 28, 1999, after filing an initial response on Defendants' behalf in this case, the Attorney General notified Defendants that his office was declining to otherwise defend the case. Doc. 48 at ¶ 2.

## II.

■■■ As amended in 1999, section 466.0282, Florida Statutes, provides that:

(1) A dentist licensed under this chapter may not hold himself or herself out as a specialist, or advertise membership in or specialty recognition by an accrediting organization, unless the dentist:

(a) Has completed a specialty education program approved by the American Dental Association and the Commission on Dental Accreditation and:

1. Is eligible for examination by a national specialty board recognized by the American Dental Association; or

2. Is a diplomate of a national specialty board recognized by the American Dental Association; or

(b) Has continuously held himself or herself out as a specialist since December 31, 1964, in a specialty recognized by the American Dental Association.

(2) A dentist licensed under this chapter may not represent to the public without appropriate disclosure that his or her practice is limited to a specific area of dentistry other than a specialty area of dentistry authorized under subsection (1), unless the dentist has attained membership in or has otherwise been credentialed by an accrediting organization which is recognized by the board as a bona fide organization for such an area of dental practice. In order to be recognized by the board as a bona fide accrediting organization for a specific area of dental practice other than a specialty area of dentistry authorized under subsection (1), the organization must condition membership or credentialing of its members upon all of the following:

(a) Successful completion of a formal, full-time advanced education program that is affiliated with or sponsored by a university-based dental school and is:

1. Beyond the dental degree;

2. At the graduate or postgraduate level; and

3. Of at least 12 months in duration.

(b) Prior didactic training and clinical experience in the specific area of dentistry which is greater than that of other dentists.

(c) Successful completion of oral and written examinations based on psychometric principles.

(3) Notwithstanding the requirements of subsections (1) and (2), a dentist who lacks membership in or certification, diplomate status, or other similar credentials from an accrediting organization approved as bona fide by either the American Dental Association or the board may announce a practice emphasis in any other area of dental practice if the dentist incorporates in capital letters or some other manner clearly distinguishable from the rest of the announcement, solicitation, or advertisement the following statement: "... (NAME OF ANNOUNCED AREA OF DENTAL PRACTICE) ... IS NOT RECOGNIZED AS A SPECIALTY AREA BY THE AMERICAN DENTAL ASSOCIATION OR THE FLORIDA BOARD OF DENTISTRY." If such an area of dental practice is officially recognized by an organization which the dentist desires to acknowledge or otherwise reference in the dentist's announcement, solicitation, or advertisement, the same announcement, solicitation, or advertisement shall also state prominently: *"(NAME OF REFERENCED ORGANIZATION) IS NOT RECOGNIZED AS A BONA FIDE SPECIALTY ACCREDITING ORGANIZATION BY THE AMERICAN DENTAL ASSOCI-*

*ATION OR THE FLORIDA BOARD OF DENTISTRY."*

Fla.Stat. § 466.0282(1) –(3) (1999) (emphasis in original).

Implant dentistry has *not* been approved as a dental specialty by the ADA.[2] Furthermore, neither the AAID nor the ABOI/ID is "a national specialty board recognized by the ADA." Fla.Stat. § 466.0282(1). Likewise, neither the AAID nor the ABOI/ID is "recognized by the [Florida Board of Dentistry] as a bona fide accrediting organization for a specific area of dental practice other than a specialty area of dentistry authorized under subsection (1)," Fla.Stat. § 466.0282(1).

### III.

Dr. Borgner wants to advertise that he is a member and Fellow of the AAID as well as a Diplomate of the ABOI/ID. He contends that amended section 466–0282 prohibits him from doing so. Defendants, on the other hand, interpret section 466.0282 differently. They say that section 466.0282 permits a dentist to advertise membership in and credentials from an organization not approved by the ADA or the Florida Board of Dentistry so long as the advertisement also includes the disclosure statement required by section 466.0282(3).

Subsection (2) of section 466.0282 states that, with one exception not applicable to Dr. Borgner, a dentist "may not represent to the public without appropriate disclosure that his or her practice is limited to a specific area of dentistry other than a specialty area" recognized by the ADA. Subsection (3) provides that, a dentist may, with appropriate disclosure, "announce a practice emphasis" in an area not recognized as a specialty area by the ADA or

the Board. The statute thus plainly permits Dr. Borgner to announce a practice emphasis in implant dentistry and/or to represent that his practice is limited to implant dentistry so long as he "incorporates in capital letters or some other manner clearly distinguishable from the rest of the announcement, solicitation, or advertisement the following statement: '[IMPLANT DENTISTRY] IS NOT RECOGNIZED AS A SPECIALTY AREA BY THE AMERICAN DENTAL ASSOCIATION OR THE FLORIDA BOARD OF DENTISTRY.'" Fla.Stat. § 466.0282(3).

Whether the statute also permits Dr. Borgner to advertise his membership in and credentials from the AAID and ABOI/ID is less clear. Subsection (1) of section 466.0282 states that, with two exceptions not applicable to Dr. Borgner, a dentist licensed in Florida may not advertise "membership in or specialty recognition by an accrediting organization." Dr. Borgner contends that subsection (1) unambiguously prohibits him from advertising his membership in and credentials from the AAID and ABOI/ID.

Defendants, on the other hand, suggest that the clear prohibition of subsection (1) should be ignored because the last sentence of subsection (3) and the first sentence of subsection (4) imply that the Florida Legislature did not mean what it said in subsection (1). The last sentence of subsection (3) states: "If [implant dentistry] is officially recognized by an organization which the dentist desires to acknowledge or otherwise reference in the dentist's ... advertisement, the same ... advertisement shall also state prominently: *'(NAME OF REFERENCED ORGANIZATION) IS NOT RECOGNIZED AS*

---

**2.** The special areas of dental practice currently recognized by the American Dental Association ("ADA") are: dental public health, endodontics, oral and maxillofacial pathology, oral and maxillofacial surgery, orthodontics and dentofacial orthopedics, pediatric dentistry, periodontics, and prosthodontics.

*A BONA FIDE SPECIALTY ACCRED- ITING ORGANIZATION BY THE AMERICAN DENTAL ASSOCIATION OR THE FLORIDA BOARD OF DEN- TISTRY.'"* Fla.Stat. § 466–0282(3) (1999) (emphasis in original). The first sentence of subsection (4) provides:

> (4) The purpose of this section is to prevent a dentist from advertising with- out appropriate disclosure membership in an organization which may be per- ceived by the public as recognizing or accrediting specialization or other unique competencies in an area of den- tistry that is not recognized or accredit- ed by the American Dental Association or the board in accordance with this section.

Fla.Stat. § 466.0282(4) (1999). According to Defendants, these two sentences reveal that the Florida Legislature intended to permit a dentist to advertise membership in and credentials from an organization not approved by the ADA or the Board so long as the advertisement also includes the re- quired disclosure statement. Indeed, that is the position taken by the Board, at least for purposes of this lawsuit.

Notwithstanding Defendants' generous construction of section 466.0282, the court is confident that Dr. Borgner's interpreta- tion is not an unreasonable one. Anything but a model of clarity, the statute—at best—can lead to a chilling effect because dentists are left to wonder whether the language in subsections (3) and (4) is suffi- cient to overcome the very clear prohibi- tion stated in subsection (1).[3] At worst, subsection (1) means what it says: "A dentist [who does not qualify for the two exceptions provided] ... may not ... ad- vertise membership in or specialty recog- nition by an accrediting organization." Ei- ther way, section 466.0282 restricts Dr. Borgner's First Amendment right to free- dom of commercial speech.

## IV.

In *Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), the Supreme Court articulated the follow- ing four-part test for assessing the consti- tutionality of a restriction on commercial speech:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask wheth- er the asserted governmental interest is substantial. If both inquiries yield posi- tive answers, we must determine wheth- er the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343.

Courts have generally divided the first element of the *Central Hudson* test, the "misleading" element, into two categories: "inherently" misleading versus "potential- ly" misleading. If speech is "inherently" misleading, it may be restricted without reference to the remaining three *Central Hudson* factors. In contrast, if speech is merely "potentially" misleading, a state may not restrict the speech unless it can satisfy the last three prongs of the *Central Hudson* analysis.

The Eleventh Circuit recently stated that the "penultimate prong" of the *Cen- tral Hudson* test requires a governmental entity to demonstrate that the restrictions

---

**3.** Defendants have submitted no evidence that any kind of an official interpretative opinion has been issued to advise dentists that section 466.0282 permits them to advertise member- ship in and credentials from an organization not approved by the ADA or the Board.

it places on speech both target an identifiable harm and mitigate against such harm in a direct and effective manner. *Mason v. The Florida Bar*, 208 F.3d 952 (11th Cir.2000). Furthermore, the court in *Mason* held that "[a governmental entity] is not relieved of its burden to identify a genuine threat of danger simply because it requires a disclaimer, rather than a complete ban, on [an individual's] speech." *Mason*, 208 F.3d at 958; *see also Ibanez v. Florida Bd. of Accountancy*, 512 U.S. 136, 114 S.Ct. 2084, 129 L.Ed.2d 118 (1994) (striking down a disclaimer requirement because the state failed "to back up its alleged concern that the [speech] would mislead rather than inform").

In *Peel v. Attorney Registration and Disciplinary Comm'n of Illinois*, 496 U.S. 91, 110 S.Ct. 2281, 110 L.Ed.2d 83 (1990), the Supreme Court held that a lawyer's use of the designation "Certified Civil Trial Specialist by the National Board of Trial Advocacy" ("NBTA") was neither actually nor inherently misleading. The Court explained that "[a] claim of certification is not an unverifiable opinion of the ultimate quality of a lawyer's work or a promise of success … but is simply a fact, albeit one with multiple predicates, from which a consumer may or may not draw an inference of the likely quality of an attorney's work in a given area of practice." *Peel*, 496 U.S. at 101, 110 S.Ct. 2281. The Court went on to note that the predicate requirements for NBTA certification were verifiable facts as well. Furthermore, the Court found that there was not only no suggestion that the NBTA issued certificates to lawyers indiscriminately but also no evidence that anyone was in fact misled or deceived by the advertisement. Absent such evidence, the

Court concluded that the lawyer's advertisement of his certification could not be considered misleading or deceptive on its face.

The Court later extended the lessons in *Peel* to a case involving a lawyer, Silvia Ibanez ("Ibanez"), who advertised her credentials as a Certified Public Accountant ("CPA") and a Certified Financial Planner ("CFP").[4] *Ibanez v. Florida Bd. of Accountancy*, 512 U.S. 136, 114 S.Ct. 2084, 129 L.Ed.2d 118 (1994). Ibanez was reprimanded by the Florida Board of Accountancy ("FBA") for engaging in "false, deceptive, and misleading" advertising. As to Ibanez's use of the CFP designation, the FBA argued that any designation using the term "certified" to refer to a certifying organization other than the FBA itself or an organization approved by the FBA "inherently mislead[s] the public into believing that state approval and recognition exists." *Ibanez*, 114 S.Ct. 2084, 129 L.Ed.2d at 125. The Court rejected the FBA's argument, noting that such argument was "difficult to maintain in light of *Peel*," *Ibanez*, 114 S.Ct. 2084, 129 L.Ed.2d at 127. The Court also rejected the FBA's argument that use of the CFP designation was potentially misleading, entitling the FBA to enact measures short of a total ban to prevent deception or confusion. The Court explained that if the " 'protections afforded commercial speech are to retain their force' … .we cannot allow rote invocation of the words 'potentially misleading' to supplant the Board's burden to 'demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.' " *Ibanez*, 114 S.Ct. 2084, 129 L.Ed.2d at 128

---

4. A private organization, the Certified Financial Planner Board of Standards, authorizes use of the trademarked designation "Certified Financial Planner" to persons who satisfy certain core educational requirements, who receive a passing score on a certification examination, who complete a planning-related work experience requirement, who agree to abide by the CFP Code of Ethics and Professional Responsibility, and who complete an annual continuing education requirement.

(cites omitted). The FBA having failed to point to any real—as opposed to hypothetical—harm, the Court concluded that the FBA's "concern about the possibility of deception in hypothetical cases is not sufficient to rebut the constitutional presumption favoring disclosure over concealment." *Ibanez*, 114 S.Ct. 2084, 129 L.Ed.2d at 127–128 (quoting *Peel*, 496 U.S. at 111, 110 S.Ct. 2281); *see also Edenfield v. Fane*, 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) (striking down Florida ban on CPA solicitation where FBA presented neither studies suggesting that personal solicitation created the dangers the FBA claimed to fear nor anecdotal evidence validating the FBA's suppositions); *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 648–649, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) (striking down restrictions on attorney advertising where "State's arguments amount to little more than unsupported assertions" without "evidence or authority of any kind").

In *Parker v. Kentucky Board of Dentistry*, 818 F.2d 504 (6th Cir.1987), the Sixth Circuit considered a Kentucky statute that prohibited general dental practitioners from holding themselves out to the public as specialists, or as being "especially qualified," in a particular branch of dentistry. As a general dental practitioner, Stanley Parker ("Parker") was permitted under Kentucky law to perform services in all recognized branches of dentistry, including orthodontia, but he was nevertheless prohibited from using the words "orthodontics," "braces," "brackets," and similar terms in advertising his services. When Parker in fact placed an advertisement in the Yellow Pages listing as some of his services, "Orthodontics with Clear & Metal Brackets," and "Orthodontics without Braces," the Kentucky Board of Dentistry instituted disciplinary proceedings against him. On appeal from the trial court's order finding the Kentucky law unconstitutional, the Kentucky Board of Dentistry argued that Parker's use of such words as "orthodontics" and "braces" could actually or potentially mislead the general public into believing that he was a "specialist" in the area of orthodontics. The Sixth Circuit, however, found that Parker's advertisement—a truthful description of services that he was permitted under Kentucky law to perform—was *not* inherently misleading. While willing to assume that Parker's advertisement could be potentially misleading, the Sixth Circuit nonetheless concluded that Kentucky's out-right ban on the use of specific, non-deceptive terms could not be justified under the Constitution or Supreme Court precedent. *See also Bingham v. Hamilton*, 100 F.Supp.2d 1233 (E.D.Cal.2000) (finding unconstitutional a California regulation that prohibited a dentist from advertising that he was a Fellow and Diplomate of the AAID and ABOI/ID respectively).

## V.

 Defendants in this case concede that the speech at issue—namely, Dr. Borgner's advertisement of his membership in and credentials from the AAID and ABOI/ID—is "potentially" rather than "inherently" misleading. Indeed, in light of *Peel, Ibanez*, and *Parker*, it would be difficult for Defendants to argue otherwise. Defendants accordingly bear the substantial burden of demonstrating that the restrictions placed on a dentist's speech by section 466.0282 both target an identifiable harm and mitigate against such harm in a direct and effective manner. Plaintiffs contend, and this court agrees, that Defendants have not satisfied such a burden.

Defendants have produced no evidence to suggest that implant dentistry is an illegitimate or unrecognized area of dental practice, that either the AAID or the ABOI/ID is a sham organization, that ei-

ther organization awards credentials or certifications indiscriminately based upon something other than objectively verifiable criteria, that anyone has complained to the Board about being misled, deceived or confused by an advertisement that includes information regarding a dentist's membership in and/or credentials from the AAID or the ABOI/ID, or that anyone has complained about a dentist who—like Dr. Borgner—has advertised his credentials in these organizations.

Interestingly, in 1994, before the Florida Legislature enacted section 466.0282, the Board itself issued a final order on a petition filed by Frank R. Recker, D.D.S., for a declaratory statement as to the ability of AAID members to advertise their status as fellows of the AAID and diplomates of the ABOI/ID. Doc. 1, Ex. D. In its order, BOD 94–01DS, the Board reported as a finding of fact that "the AAID and the ABOI/ID are bona fide organizations that credential dentists in the area of implant dentistry." *Id.* at 2. The Board also reported as a conclusion of law that the Florida statutes and/or administrative rules then in effect permitted a dentist to advertise his or her "Fellow" status in the AAID as well as his or her "Diplomate" status in the ABOI/ID so long as the advertisement did not imply to the public that the advertising dentist had obtained specialty status. *Id.* The Board said nothing in its order to suggest that advertisement of a dentist's credentials in the AAID and/or the ABOI/ID might be misleading to the public.

The record establishes that any dentist with a general license to practice as a dentist may perform implant dentistry in Florida. Does it not defy common sense to think that the public might be harmed by learning that a dentist, whose practice includes implant dentistry, has taken the extra steps necessary to become a credentialed member of an implant organization?

If anyone has a question or a concern about what a dentist's credentials from the AAID and/or the ABOI/ID mean, it takes only a few minutes with access to the Internet to learn precisely what the dentist was required to do to earn those credentials.

While Defendants do not dispute that Dr. Borgner's credentials from the AAID and ABOI/ID—along with the predicate requirements for those credentials—constitute verifiable facts, they nevertheless contend that "[i]t can reasonably be expected that many consumers would assume that a person advertising certification as a dental specialist has received such certification either from a state agency or from a board recognized by a state agency." Doc. 64 at 10. To support their contention, Defendants have filed a document that presents the results of a recent survey commissioned by the Board for purposes of this litigation. The survey—entitled "A Study of Florida Residents Regarding Attitudes about the State of Florida's Role in Certifying Dental Specialists"—was conducted by the Florida Survey Research Center between December 15, 1999, and January 5, 2000.

On January 6, 2000, one day after the survey was concluded and one day before the end of the twice-extended discovery period, Defendants provided Plaintiffs with a copy of the final report setting out the results of the just-completed survey. On January 27, 2000, twenty days after the close of discovery and without ever before disclosing the name of an expert witness, Defendants filed—as attachments to their summary judgment motion—the final reports of two studies—the recent study as well as an earlier study completed in 1998—along with a copy of an affidavit signed by Dr. Michael J. Scicchitano ("Dr.Scicchitano"). Dr. Scicchitano disclosed that he was the Director of the

Florida Survey Research Center and the man under whose supervision the surveys were designed and conducted. While he also represented that the surveys met "generally accepted industry standards for representative sampling of the general population," he provided no other information regarding survey design and methodology. Doc. 64, Ex. B. The original of that affidavit was filed on February 1, 2000. Doc. 67.[5]

On February 9, 2000, noting Defendants' "obtuse attempt to circumvent the already generous discovery extensions granted to the Defendants," Plaintiffs filed a motion to strike both the affidavit and the final survey reports submitted by Defendants. Doc. 69. Needless to say, the timing of Defendants' disclosures made it difficult, if not impossible, for Plaintiffs to depose either Dr. Scicchitano or an expert of their own choosing who could render an opinion about the surveys' design, methodology, and/or results. Significantly, Dr. Scicchitano's affidavit and the survey reports represent the only evidence produced by Defendants.

While sympathetic to Plaintiffs' complaints about Defendants' untimely disclosures, the court declines to strike Defendants' evidence based on discovery abuses alone. Any prejudice accruing to Plaintiffs from lack of opportunity to meet Defendants' late-filed surveys could be cured by permitting Plaintiffs to take additional depositions at Defendants' expense. Additional depositions are unnecessary, however, because the court finds that Dr. Scicchitano's affidavit, combined with his final survey reports, are altogether insufficient to satisfy Defendants' burdens under *Central Hudson.*

Survey results offered as proof of the matter asserted are hearsay and are inadmissible unless the survey falls into a recognized class exception to the hearsay rule or into the residual exception contained in Federal Rule of Evidence 807. Arguably, the surveys in this case fall into the category of statements excepted from the hearsay rule under Rule 803(3): namely, statements that express a declarant's state of mind at the time of the utterance. *Schering Corp. v. Pfizer, Inc.,* 189 F.3d 218 (2d Cir.1999). If not excepted under Rule 803(3), the surveys would perhaps be admissible under Rule 807, which provides:

A statement not specifically covered by Rule 803 or 804 but having equivalent *circumstantial guarantees of trustworthiness,* is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed.R.Evid. 807 (emphasis added). With regard to survey evidence, at least one court has said that "the circumstantial guarantees of trustworthiness are for the most part satisfied if the [survey] is conducted in accordance with generally accepted survey principles." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494 (3d Cir.1998) (quoting *Pittsburgh*

---

5. In the earlier litigation, Case No. 97cv93, months after the discovery period closed, Defendants asked the court to reopen discovery to permit the filing of "a recently completed Report" of a survey conducted by the Florida Survey Research Center between February 3, 1998, and February 15, 1998. The report was accompanied by an affidavit from Dr. Kenneth D. Wald, a previously-undisclosed expert under whose supervision the survey was conducted. Dr. Wald's affidavit contained a description of the study/survey along with his interpretation of the survey results. The court denied Defendants' request.

*Press Club v. United States,* 579 F.2d 751, 758 (3d Cir.1978)).

Assuming, just for the sake of argument, that Defendants' surveys are admissible, the court is nonetheless unwilling to accord the surveys much weight. The 1998 survey, entitled "A Study of Florida Residents Regarding Dentists and Dental Specialists," was "designed to determine whether laypersons [would] be drawn to dentists who advertise themselves as 'certified' or 'specialists' by virtue of membership in organizations that have not been recognized as acceptable credentialing organizations by the ADA." Doc. 64, Ex. C. The more recent survey was designed to assess "respondents' perceptions of the role of the State of Florida in assuring the qualifications of dentists that advertise themselves as specialists in a particular area." Doc. 64, Ex. B. Neither survey assessed what, if any, harm would result from permitting a dentist to advertise either a practice emphasis in implant dentistry or membership in and credentials received from the AAID or ABOI/ID.

In the 1998 survey, one thousand (1000) individuals were interviewed by phone regarding their attitudes about dentists and dental specialists. When asked to indicate how important each of six sources [6] of information was to their decision to select an orthodontist or "implant specialist," just under eighty percent (80%) of the respondents revealed that it was "somewhat" if not "very" important to know that an orthodontist or "implant specialist" was certified as a specialist by an ADA-approved board. Over eighty percent (80%) of the respondents indicated that a recommendation by a friend or family member was either "very" or "somewhat" important to their decision. More than half of the re-

spondents indicated that yellow-page or other advertisements were either "not very" or "not at all" important to their decision to select an "implant specialist." It is not apparent what the respondents answers would have been had they been told that the ADA does not recognize implant dentistry as a "specialty," that there is no "ADA-approved board" that certifies dentists as "implant specialists," or that the Florida Board of Dentistry considers all licensed dentists qualified to practice implant dentistry.

The telephone respondents were also asked how familiar they were with the ADA, the AAID, and the "National Council for Dental Implants," the latter being a fictitious organization used as a baseline to compare responses regarding the other two dental certifying organizations. Approximately fifty-seven percent (57%) of the respondents were either "very familiar," "familiar," or "somewhat familiar" with the ADA. In contrast, little more than five percent (5%) of the respondents indicated that they had some level of familiarity with the AAID. Four percent (4%) actually revealed a level of familiarity with the fictitious organization, which suggests that a similar percentage of respondents may have feigned familiarity with the ADA and/or the AAID.

Slightly more than half of the respondents who said they were either "very" or "somewhat" familiar with the AAID also said that they would be more willing to visit, to express confidence in, and to trust the recommendations of, a dentist who they knew to be certified as a "specialist" by the AAID. Approximately eighty percent (80%) of the respondents familiar with the ADA said they would be more willing

---

**6.** The telephone respondents were asked about the following six sources of information: a friend's or relative's recommendation, an advertisement, an insurance company's

recommendation, an ADA-approved board's certification, a yellow pages advertisement, and a recommendation by a family dentist.

to visit, to express confidence in, and to trust the recommendations of, a dentist known to be certified as a "specialist" by the ADA.

Professor Kenneth D. Wald rendered the following opinion about the findings of the 1998 survey:

These findings indicate that advertisement about "certification" and/or "specialization" in implant dentistry—regardless of whether respondents know the credentialing agency or not—will persuade much of the public that such dentists are worthy, capable, and trustworthy. **Such advertising will confer a professional advantage upon dentists who advertise themselves as credentialed by organizations that are not accepted by the American Dental Association.** By virtue of its trust in credentialing and lack of expertise, a large proportion of the public is ripe to be misled in the choice of dentists to perform implantation. The public lacks the knowledge to discern the value of credentialing by organizations that have and have not been approved by the American Dental Association. It is also clear that the public would put great confidence in the judgment of the American Dental Association if that organization chose to recognize a credentialing body in implant dentistry. Because the American Dental Association does not recognize such a certification, the public will be disposed to choose dentists who advertise such credentials from the AAID over members of the American Dental Association who forego such advertising—even though the public puts considerable trust in the ADA.

Doc. 64, Ex. C., Dr. Wald's Aff. at ¶ 16 (emphasis in original).

As indicated by Dr. Wald, the results of the 1998 survey suggest that dentists who advertise "certification" and/or "specialization" may have a competitive edge over dentists who do not so advertise. The survey does not establish that any such competitive edge is unmerited. The survey also does not establish that dentists who advertise "certification" or "specialization" are less worthy, capable, and trustworthy than dentists who either have no "certification" or "specialization" to advertise or who have a "certification" or "specialization" but choose not to advertise it. Quite simply, the 1998 survey may have produced results of interest to the ADA, but it did not produce results sufficient to convince this court that the infringements imposed by section 466.0282 on Dr. Borgner's First Amendment rights are constitutional.

With the more recent survey, Defendants have not included an expert's interpretation of the results. Left to its own devices, the court finds that the second survey is no more helpful than the first. The very brief survey report reveals that five hundred (500) individuals were interviewed by phone about their perceptions regarding the State of Florida's role in overseeing dentists who advertise (1) as being specialists in a particular area, (2) as being board-certified specialists in a particular area, or (3) as having practices limited to a certain area. Although the report fails to set out the precise questions that were asked of the respondents, it appears that nearly two-thirds of the respondents said they believed that dentists who advertise as being board-certified specialists in a particular area have been certified directly by the State of Florida or certified by a national organization that is recognized by the State of Florida. In addition, the report indicates that approximately fifty-seven percent (57%) of the respondents said they believed that dentists who advertise as being specialists in a particular area or as having their practices limited to a certain area have been either directly or indirectly certified by the State

of Florida. Again, while these results may be interesting, they do not convince this court that the State of Florida, through enactment of section 466.0282, targets a genuine threat of harm and/or furthers substantial state interests in a direct and effective manner.

Absent any other evidence to support the restrictions placed on Dr. Borgner's First Amendment rights by section 466.0282, this court finds that Defendants have failed to satisfy their burden under the *Central Hudson* test. Plaintiffs are therefore entitled to summary judgment.

Accordingly, it is ORDERED:

1. Plaintiffs' motion for summary judgment (doc. 59) is GRANTED.

2. Defendants' motion for summary judgment (doc. 62) is DENIED.

3. Section 466.0282, as amended, is DECLARED unconstitutional to the extent it prohibits Dr. Borgner from advertising his membership in the AAID and his credentialed status in the AAID and ABOI/ID, and Defendants are EN-JOINED from enforcing section 466.0282, as amended, against Dr. Borgner for advertising his membership in the AAID and his credentialed status in the AAID and ABOI/ID.

4. Section 466.0282, as amended, is also DECLARED unconstitutional to the extent that it prohibits Dr. Borgner from either representing to the public that his practice is limited to implant dentistry or announcing a practice emphasis in implant dentistry without also incorporating a disclosure statement. Defendants are EN-

JOINED from enforcing the disclosure requirement of section 466.0282, as amended, against Dr. Borgner.

5. The clerk is directed to enter judgment in Plaintiffs' favor, with costs taxed to Defendants.