[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 15-14394 & 15-15256
_____

D.C. Docket No. 1:14-cv-22072-JLK

FF COSMETICS FL, INC.,
a Florida corporation,
d.b.a. Forever Flawless Cosmetics 1,
TIMELESS COSMETICS FL, INC.,
a Florida corporation,
BRILLIANCE NEW YORK, LLC,
a New York limited liability company,
f.k.a. Brilliance New York, Inc.,
OCEANE FL COSMETICS, INC.,

Plaintiffs - Appellees,

versus

CITY OF MIAMI BEACH,

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(August 10, 2017)

Before MARCUS and DUBINA, Circuit Judges, and GOLDBERG,[*] Judge.

DUBINA, Circuit Judge:

In this consolidated interlocutory appeal, Appellant City of Miami Beach ("City") challenges the district court's order granting Appellees FF Cosmetics FL Inc., Timeless Cosmetics FL Inc., Brilliance New York LLC, and Oceane FL Cosmetics Inc.'s ("Retailers") renewed motion for a preliminary injunction, and denying the City's motions for clarification and for reconsideration. The preliminary injunction enjoins the enforcement of two City ordinances that restrict commercial solicitation and handbilling in sections of five streets in the Historic Art Deco District.

After careful review, and having the benefit of oral argument, we affirm.

## I. BACKGROUND

Retailers operate cosmetic stores along Lincoln Road in the City of Miami Beach's Historic District. Each store depends on solicitation as its primary, and most effective, form of advertisement, employing several greeters to stand outside the storefront and attract potential customers inside. Reports of the greeters' methods range from benign salutations, offers of free samples, and distribution of handbills to allegations of cat-calling, harassment, and uninvited touching. There

---

[*] Honorable Richard W. Goldberg, Judge of the United States Court of International Trade, sitting by designation.

is no evidence presented to suggest that the Retailers engaged in direct sales pitches of products outside of the stores.

The City is not primarily concerned with the individual actions of Retailers, but rather with the collective effects of the numerous greeters employed by many stores and restaurants along Lincoln Road and certain other areas of the City's Historic District. Visitors, storeowners, and residents of the Historic District testified to the annoyance, inconvenience, and general unpleasantness of being barraged with menus, free samples, and comments from greeters. The record shows that individuals expressed concerns about the effects on tourism, property values, quality of life, and the unique aesthetic of the City's Historic District.

In response to the flood of complaints stemming from solicitation and handbilling activities in the Historic District, the City began enforcing Section 74-1, an anti-solicitation ordinance, and Section 46-92, an anti-handbilling ordinance. Testimony from the Director of Code Compliance for the City indicated that the number of complaints in the Historic District increased substantially, resulting in Code Compliance staff being pulled from other locations to deal with the commercial solicitation problem.

After receiving a number of citations pursuant to Section 74-1 and Section 46-92, Retailers brought suit against the City under 42 U.S.C. § 1983, challenging the constitutionality of the ordinances. Specifically, Retailers argued that the

3

ordinances were overbroad, unconstitutionally vague, and violative of the Due Process Clause, the Equal Protection Clause, and the First Amendment. Retailers sought permanent injunctive relief, as well as damages incurred from fines and lost business resulting from the enforcement of the ordinances. Retailers also filed for a preliminary injunction.

Both parties agreed to stay litigation pending the outcome of the City's attempts to amend the ordinances at issue. The City held public hearings to address the problem and employed other fact-finding tactics, such as requesting public feedback on social media, searching review websites such as Yelp, and reviewing past complaints filed with the City.

The City presented evidence showing that it considered a number of alternative prohibitions. First, the former Assistant City Manager testified that the City considered "free speech 'bubbles,' which would essentially require that any commercial solicitation activities take place beyond a minimum threshold distance surrounding a pedestrian." As to the viability of this regulation, he stated,

> "[Free speech bubbles] would have never worked. First of all, what's the difference between 2 feet 8 inches and 3 feet? Evidentiary problem at a hearing. And it's so congested now. It's a popular street, all of them are, it would be a looser [sic]. You can't keep that level of distance from people on Lincoln Road without bumping into somebody else's zone. You know, it doesn't exist in the one person vacuum so we just didn't feel that that was feasible."

4

Second, the former Assistant City Manager stated the City considered creating zones in which commercial solicitation would be permitted. This idea was ultimately rejected because, "enforcement is a problem. We tried not to write something that we couldn't understand how to enforce. If everybody is just in this box, it becomes a bazaar. There would be yelling. It would have had the opposite effect in my opinion."

Finally, the former Assistant City Manager testified that the City considered banning only aggressive solicitation, but determined that establishing an "aggressive" standard would be an enforcement nightmare, and that it wouldn't solve the problem of the volume of solicitation.

Ultimately, the City amended both ordinances to read as follows:

**Sec. 74-1. Soliciting business in public.**
(a) *Prohibitions*. It shall be unlawful to solicit any person for the purpose of inducing such person to purchase any property, real or personal, or any food, beverage, or service, or to solicit such person to enter any place of business for the purpose of inducing or attempting to induce such person to purchase any property, real or personal, or any food, beverage, or service.

This Section shall apply when the solicitor or the person being solicited is located on any public right-of-way, which means and includes, but is not limited to, any street, sidewalk, street corner, curb, bicycle path, or pedestrian walkway, in any of the following areas in the City of Miami Beach. This Section shall also apply to any doorway, stairway, window or other opening of a building abutting on or adjacent to such right-of-way, in any of the following areas in the City of Miami Beach:

(1) The area bounded on the north by, but not including, 17th Street, bounded on the east by, but not including, Washington Avenue,

5

bounded on the south by Lincoln Lane, and bounded on the west by Alton Road;

(2) Ocean Drive from 5th to 15th Streets;

(3) Collins Avenue from 5th to 15th Streets;

(4) Washington Avenue from 5th to Lincoln Road;

(5) All cross streets and bystreets bounded on the north by 15th Street, bounded on the east by Ocean Drive, bounded on the south by 5th Street, and bounded on the west by Washington Ave;

(6) Española Way from Pennsylvania Avenue to Collins Avenue; and

(7) Lummus Park.

**Sec. 46-92.  Litter; definitions; prohibitions on litter; penalties for litter and commercial handbill violations; commercial handbill regulations, fines, and rebuttable presumptions; seizure and removal of litter by the city; enforcement; appeals; liens.**

(a) *Definitions*.  The following words, terms and phrases, when used in this article, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

. . .

(3) *Handbill* means any handbill, flyer, paper, document, dodger, circular, folder, booklet, letter, card, pamphlet, sheet, poster, sticker, banner, notice or other written, printed or painted matter or object that conveys any information, except that "handbill" shall not include a newspaper or its contents.

(4) *Commercial handbill* means any handbill that conveys any information about any good or service provided by a business.

. . .

(g) *Prohibitions on commercial handbill distribution.*

(1) *Historic Areas*.  It shall be unlawful for any person to distribute commercial handbills on the right-of-way in any of the following areas in the City of Miami Beach:

    a. The area bounded on the north by, but not including, 17th Street, bounded on the east by, but not including, Washington

6

Avenue, bounded on the south by Lincoln Lane, and bounded on the west by Alton Road;

b. Ocean Drive from 5th to 15th Streets;

c. Collins Avenue from 5th to 15th Streets;

d. Washington Avenue from 5th to Lincoln Road;

e. All cross streets and bystreets bounded on the north by 15th Street, bounded on the east by Ocean Drive, bounded on the south by 5th Street, and bounded on the west by Washington Ave;

f. Española Way from Pennsylvania Avenue to Collins Avenue; and

g. Lummus Park.

The prohibitions in this subsection (g) shall apply to the distribution of commercial handbills on any right-of-way, including but not limited to any doorway, stairway, window or other opening of a building abutting on or adjacent to such right-of-way.  All rights-of-way identified as prohibited areas shall include the entire width of the right-of-way, including all sidewalks.

(2) *Sidewalk cafes*.  Commercial handbills shall not be distributed on the right-of-way:

a. Within 20 feet in any direction from the outside perimeter of any approved sidewalk cafe (as indicated in the approved site plan attached to the city-issued permit); and

b. On any right-of-way within the approved sidewalk cafe.

(3) *Beaches*.  Commercial handbills shall not be distributed on any city beach east of the dunes.

The effect of the amendments was to limit the commercial solicitation and handbilling prohibitions to within defined boundaries in the Historic District.  The Amended Ordinances regulate approximately 11.75% of the Art Deco District, 5.7% of the City's Historic District, and 3% of the City of Miami Beach.  All other previous restrictions on solicitation and handbilling were rescinded.

7

As support for the amended ordinances, the City cited ten interests: (1) protecting the historic character of the District; (2) developing the high-end retail and high-end sidewalk café promenades in the District; (3) promoting luxury tourism; (4) minimizing harassment of pedestrians along the public right-of-way; (5) minimizing congestion; (6) reducing litter; (7) improving the aesthetic of the District for residents and visitors; (8) protecting pedestrians' right to be left alone; (9) maintaining the unique ambiance of the District; and (10) encouraging expansion in other areas of the City where commercial solicitation is allowed.

On December 3, 2014, Retailers filed an amended complaint and renewed their motion for a preliminary injunction, seeking to invalidate the amended ordinances. The district court held five hearings over the course of several months and ultimately granted Retailers' motion for a preliminary injunction. Critically, the district court held–while acknowledging that the City's interests are substantial and that the ordinances directly advance those interests–that the ordinances were not narrowly tailored, and thus that Retailers were likely to succeed on the merits. Additionally, the district court found that Retailers were likely to succeed on their claim that the anti-handbilling ordinance was facially overbroad. The City filed motions for clarification and reconsideration, which the district court denied. In this appeal, the City challenges the district court's grant of a preliminary injunction with respect to the amended ordinances.

8

## II. STANDARDS OF REVIEW

Preliminary injunctions are reviewed for an abuse of discretion, and the legal conclusions on which they are based are reviewed de novo. *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). Whether a regulation is narrowly tailored is a legal question that is reviewed de novo. *See Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1251 n.17.

Generally, if a district court makes a clearly erroneous finding of fact it is an abuse of discretion. However, we review issues of constitutional fact de novo. *Am. Civil Liberties Union of Fla.*, 557 F.3d at 1198. Thus, if we disagree with the district court's findings of fact as to whether the ordinance is more extensive than necessary, the decision to enter a preliminary injunction is an abuse of discretion. *See Don's Porta Signs, Inc. v. City of Clearwater*, 829 F.2d 1051, 1053 n.9 (11th Cir. 1987) ("In cases involving first amendment claims, an appellate court must make an independent examination of the whole record. . . . [A]n appellate court is not bound by the 'clearly erroneous' standard of review in determining whether a commercial speech regulation directly advances the government's goals or is more extensive than necessary."); s*ee also Am. Civil Liberties Union of Fla.,* 557 F.3d at 1198 ("[W]e review *de novo* the core constitutional fact relating to the Board's motive. That means if we disagree with the district court's finding about the

Board's motive, its decision to enter a preliminary injunction was an abuse of discretion.").

## III. DISCUSSION

"A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).  A preliminary injunction is an "extraordinary and drastic remedy" and should not be granted unless "the movant clearly establishe[s] the 'burden of persuasion' as to each of the four prerequisites." *Id*. (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir.1998)) (quotations omitted).  Although the initial burden of persuasion is on the moving party, the ultimate burden is on the party who would have the burden at trial.  *See Edenfield v. Fane*, 507 U.S. 761, 770, 113 S. Ct. 1792, 1800 (1993) (noting that a party who seeks to uphold a commercial speech restriction bears the burden of justifying it).

The district court correctly noted that an ongoing violation of the First Amendment constitutes an irreparable injury.  *See Elrod v. Burns*, 427 U.S. 347, 373-74, 96 S. Ct. 2673, 2690 (1976).  Likewise, the district court correctly

10

concluded that in this case the injury to Retailers' First Amendment rights outweighs the City's interests in aesthetics. *See KH Outdoor, LLC v. Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Finally, the district court correctly ruled that enjoining the ordinances, if they were found to be in violation of the First Amendment, would advance the public's interest in freedom of speech. *See id.* at 1272-73.

Thus, the critical question we must decide is whether Retailers are substantially likely to prevail on the claims that Sections 74-1 and 46-92 violate the First Amendment.[1]

## A. THE DISTRICT COURT DID NOT ERR IN FINDING THAT RETAILERS WERE LIKELY TO SUCCEED ON THE MERITS WITH RESPECT TO SECTION 74-1.

The law is clear that commercial speech is afforded lesser protections than those traditionally given to noncommercial speech. *See Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477, 109 S. Ct. 3028, 3033 (1989). Thus, a restriction on commercial speech is valid under the First Amendment if (1) the speech is not misleading and does not concern unlawful activity, (2) the government has a substantial interest in restricting the speech, (3) the regulation directly advances the asserted government interest, and (4) the regulation "is not

---

[1] Retailers make several other arguments as to why Sections 74-1 and 46-92 should be struck down as unconstitutional. Specifically, Retailers argue that (1) Section 46-92 is underinclusive, (2) the ordinances are void for vagueness, and (3) the ordinances violate equal protection. We find these arguments unpersuasive.

more extensive than is necessary to serve that interest." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566, 100 S. Ct. 2343, 2351 (1980).

As an initial matter, the district court correctly discerned that the solicitation ordinance targets commercial speech. *See id.* at 561, 100 S. Ct. at 2349 (defining commercial speech as "expression related solely to the economic interests of the speaker and its audience"). Furthermore, the district court also correctly found that Retailers' commercial speech falls under the protection of the First Amendment.[2]

Moreover, the district court correctly found that the City's asserted interests are substantial: "substantial witness testimony" demonstrated that "solicitations and handbilling in Miami Beach's historic district is a problem that exists in fact, and that it causes annoyance and aesthetic harm." *See also Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 806, 104 S. Ct. 2118, 2129 (1984) ("[M]unicipalities have a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression."); *Messer v. City of*

---

[2] The City alleges that Retailers' speech is false and misleading, and provided expert witness testimony showing that Retailers' claims about the ingredients and effectiveness of the products sold were "preposterous." However, the district court did not abuse its discretion in finding that there was no evidence proving that these sales pitches were made outside of the store. Because the ordinance seeks to prohibit commercial solicitation on the public right-of-way–not to regulate the efficacy of cosmetics–the district court correctly held that Retailers showed a substantial likelihood of success on their claim that this commercial speech was entitled to First Amendment protection. *See Edenfield*, 507 U.S. at 765, 113 S. Ct. at 1797 ("We need not parse [Plaintiff's] proposed communications to see if some parts are entitled to greater protection than the solicitation itself. This case comes to us testing the solicitation, nothing more. That is what the State prohibits and [Plaintiff] proposes.").

*Douglasville, Ga.*, 975 F.2d 1505, 1510 (11th Cir. 1992) ("A government has a more significant interest in the aesthetics of designated historical areas than in other areas.").

Relatedly, the district court correctly noted that the anti-solicitation ordinance likely directly advances the City's interest, finding that "[t]he City adduced sufficient evidence . . . that the anti-solicitation ordinance has helped to reduce solicitations." *See also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555, 121 S. Ct. 2404, 2422 (2001) (permitting the use of consensus, anecdotes, and "simple common sense" to justify speech restrictions) (quotations omitted).  As such, the only remaining question is whether Section 74-1 is narrowly tailored to serve the substantial interests of the City.  Because the preliminary record shows that the City disregarded numerous and obvious less-burdensome alternatives, the district court did not err when it concluded that Section 74-1 is not narrowly tailored.

The City bears the burden of demonstrating that Section 74-1 is appropriately tailored in light of the substantial interests it seeks to achieve.  *See Edenfield*, 507 U.S. at 770-71, 113 S. Ct. at 1800.  To survive First Amendment scrutiny, a commercial speech prohibition must employ "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not

13

necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective.  Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed." *Fox*, 492 U.S. at 480, 109 S. Ct. at 3035 (quotations and citation omitted).  "By declining to impose . . . a least-restrictive-means requirement, we take account of the difficulty of establishing with precision the point at which restrictions become more extensive than their objective requires, and provide the Legislative and Executive Branches needed leeway in a field (commercial speech) traditionally subject to governmental regulation." *Id.* at 480-81, 109 S. Ct. at 3035 (quotations omitted).

In *Fox*, the Supreme Court provided concrete examples of what does and does not violate the First Amendment.  The Court explained,

> None of our cases invalidating the regulation of commercial speech involved a provision that went only marginally beyond what would adequately have served the governmental interest.  To the contrary, almost all of the restrictions disallowed under *Central Hudson's* fourth prong have been substantially excessive, disregarding far less restrictive and more precise means.  On the other hand, our decisions *upholding* the regulation of commercial speech cannot be reconciled with a requirement of least restrictive means.  In *Posadas*, for example, where we sustained Puerto Rico's blanket ban on promotional advertising of casino gambling to Puerto Rican residents, we did not first satisfy ourselves that the governmental goal of deterring casino gambling could not adequately have been served (as the appellant contended) not by suppressing commercial speech that might *encourage* such gambling, but by promulgating additional speech designed to *discourage* it.  Rather, we said that it was up to the legislature to decide that point, so long as its judgment was reasonable.  Similarly, in *Metromedia, Inc. v. San Diego*, where we upheld San Diego's complete ban

14

of off-site billboard advertising, we did not inquire whether *any* less restrictive measure (for example, controlling the size and appearance of the signs) would suffice to meet the city's concerns for traffic safety and esthetics.

*Id.* at 479, 109 S. Ct. at 3034 (citations and quotations omitted) (emphasis in original).

Similarly, this court has upheld prohibitions on commercial speech despite the availability of potentially less-restrictive alternatives. *See, e.g.*, *Messer*, 975 F.2d at 1511 (upholding a complete ban on off-premises signs in the City of Douglasville's historic district); *Supersign of Boca Raton, Inc. v. City of Fort Lauderdale*, 766 F.2d 1528, 1532 (11th Cir. 1985) ("The district court also reached an erroneous conclusion under the fourth part of the *Central Hudson* analysis. It found that less restrictive means were available to effectuate the desired goals because the city could have employed time, place and manner restrictions on the operation of advertising vehicles rather than impose an outright ban. . . . In this case, Fort Lauderdale has not attempted to prohibit any advertising that offers no threat to traffic safety or aesthetic improvement: each advertising vehicle and craft contributes to the problem.").

However, there is a significant distinction between failing to employ less-restrictive means and completely disregarding obvious less-burdensome alternatives. While our analysis is "limited to whether the means are reasonably and narrowly drawn to further the objective," and we "should not attempt to

15

speculate as to whether less restrictive means exist," *Harnish v. Manatee Cty.*, 783 F.2d 1535, 1540 (11th Cir. 1986), "if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13, 113 S. Ct. 1505, 1510 n.13 (1993). By ignoring far less restrictive and precise means, it is likely that an ordinance burdens substantially more speech than necessary. *See Fox*, 492 U.S. at 479, 109 S. Ct. at 3034.

Here, we affirm the preliminary injunction prohibiting the enforcement of Section 74-1 because the record suggests that the ordinance is not narrowly tailored–specifically that the City failed to consider numerous and obvious less-burdensome alternatives.[3] We need not speculate about potential alternatives because this preliminary record is replete with numerous and obvious less-burdensome options. The City itself offered these alternatives for the trial court's consideration. Thus, for example, the former Assistant City Manager testified that "things like charitable solicitations" are allowed in the same areas but are regulated

---

[3] The district court found that Section 74-1 was a disfavored "blanket ban," and consequently not narrowly tailored. It is unclear whether Section 74-1 is a blanket ban, and whether such status warrants an injunction. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508, 101 S. Ct. 2882, 2893 (1981) (stating that a blanket ban is permissible when it is "the most direct and perhaps only effective approach"). Because the record suggests that there are numerous and obvious less-burdensome alternative commercial speech restrictions, we conclude that Section 74-1 is not narrowly tailored, and we decline to reach the blanket ban issue.

by permits.  Further, artists and vendors are allowed to sell their goods, but they are regulated "by a lottery," "they are spaced appropriately," their "volume is regulated," and "[t]he footprint[s] of the[ir] display[s] . . . [are] also heavily regulated."  The City offered no explanation why it did not even consider these less-restrictive alternatives, which currently regulate charities, artists, and vendors, or why these alternatives could not also be used to regulate commercial solicitation.

Comparing Section 74-1 to the Key West ordinance at issue in *Sciarrino v. City of Key West* further highlights the existence of numerous and obvious less-burdensome alternatives.  83 F.3d 364 (11th Cir. 1996).  While the Key West ordinance completely banned solicitation on public parking lots and public beaches, solicitation "was significantly restricted, but not banned, on five historic streets heavily trafficked by pedestrians."  *Id.* at 366.  Importantly, Key West allowed solicitation through a permitting system, which gave each business a certain number of solicitation permits and set other restrictions on solicitation.  *See id.*  Again, here, the City failed to even address the potential viability of such a system.  While the law does not require the use of the least-restrictive means, such as a permitting system, an ordinance cannot be said to be narrowly tailored if the record shows that obvious less-burdensome alternatives were completely disregarded.

17

In short, the clear availability of obvious less-restrictive alternatives suggests, as it did to the district court on this preliminary record, that Retailers have established a substantial likelihood of success on the merits.  As such, we affirm the grant of a preliminary injunction with respect to Section 74-1.

**B. THE DISTRICT COURT CORRECTLY FOUND THAT RETAILERS WERE LIKELY TO SUCCEED ON THE MERITS WITH RESPECT TO SECTION 46-92.**

Unlike Section 74-1, the district court proceeded directly to an overbreadth analysis when it considered Section 46-92, the anti-handbilling ordinance.  To determine whether Section 46-92 is unconstitutionally overbroad, first it must be determined that the ordinance regulates more than just commercial speech.  *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95, 102 S. Ct. 1186, 1191-92 (1982).  Second, if non-commercial speech is prohibited, there must be a substantial risk that Section 46-92 will have an impermissible chilling effect on protected speech.  *Broadrick v. Oklahoma*, 413 U.S. 601, 612-13, 93 S. Ct. 2908, 2916 (1973).  Although overbreadth challenges are a disfavored mechanism for invalidating an ordinance, given the fact that Section 46-92 prohibits the distribution of "any handbill that conveys any information about any good or service provided by a business," the district court properly found that Retailers showed a substantial likelihood of success on their claim that the handbilling ordinance was overbroad.

18

In *Dimmitt*, we noted that the "overbreadth doctrine does not apply where the *entire* scope of the statute restricts only commercial speech." *Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1571 (11th Cir. 1993) (emphasis in original). However, "[w]here the statute governs both commercial and noncommercial speech . . . a litigant with a commercial speech interest may nonetheless qualify by virtue of the overbreadth rule to assert the speech rights of third parties with noncommercial speech interests." *Id.*

The Supreme Court in *Fox* considered the State University System of New York's (SUNY's) prohibition of "private commercial enterprises [] operat[ing] on State University campuses or in facilities furnished by the University." *Fox*, 492 U.S. at 471-72, 109 S. Ct. at 3030 (quotations omitted). SUNY defined prohibited commercial speech as speech "where the end result is the intent to make a profit by the invitee." *Id*. at 482, 109 S. Ct. at 3036 (quotations omitted). The Court concluded that such a broad definition covered more than just "speech that proposes a commercial transaction," e.g., newspapers, and political advertisements. *Id.* (emphasis omitted). As such, the prohibition regulated both commercial and non-commercial speech and was subject to an overbreadth attack. *Id*.

Similarly, in *Solomon*, we found that Section 29-100(b)(2) of the Gainesville code, which prohibited "street graphics: signs or any other street graphics displaying any statement, word, character or illustration of an obscene, indecent or

19

immoral nature," regulated both commercial and non-commercial speech. *Solomon v. City of Gainesville*, 763 F.2d 1212, 1213 (11th Cir. 1985).  This court looked at the stated intent, "to authorize street graphics, large enough to sufficiently convey a message about the owner or occupants of a particular property, the products or services available on such property, or the business activities conducted on such property, yet small enough to preserve and protect the natural beauty of the City and limit distractions to motorists," *id.* at 1214 (quotations and alteration omitted), and concluded "[n]owhere does the ordinance explicitly differentiate between commercial and non-commercial speech.  Indeed, owners or occupants of a particular property in Gainesville may wish to display a street graphic with no commercial purposes but which involves protected speech." *Id*.

In contrast, while not analyzing the language under an overbreadth challenge, this court upheld the Key West ordinance that defined off-premise canvassing as the "distribution of information or solicitation of customers . . . in connection with a business."  *Sciarrino*, 83 F.3d at 370.

Here, Section 46-92 prohibits the "distribution of commercial handbills," defined as "any handbill that conveys any information about any good or service provided by a business."  The district court found that the prohibition extends to non-commercial speech.  Specifically, the district court provided a number of

20

examples of non-commercial speech seemingly prohibited by Section 46-92, such as an animal-rights activist protesting McDonalds, the distribution of bumper stickers protesting the Seaquarium's treatment of whales, and a food critic who distributes flyers listing restaurant reviews in order to attract more visitors to her website.

By defining commercial handbills to include any information about a business, the language of Section 46-92 is similar to the prohibition in *Fox*.  The ordinance seemingly covers more than just speech proposing a commercial transaction.  Although the City argues that the ordinance distinguishes between commercial and non-commercial messages because it explicitly targets only commercial speech, the City's definition of "commercial handbilling" is problematic.  The language is unlike the prohibition in *Sciarrino* where the text of the ordinance clearly stated that the prohibition applies when the target audience is a "customer."  In contrast, a prohibition on "any" message about "any" good or service provided by a business can reasonably be read to prohibit non-commercial messages.  Thus, Retailers have shown a substantial likelihood of success on their claim that Section 46-92 is susceptible to an overbreadth attack.

To succeed on an overbreadth challenge, Retailers "bear[] the burden of demonstrating, 'from the text of [the law] and from actual fact,' that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122, 123 S. Ct. 2191, 2198

(2003) (quoting *N.Y. State Club Ass'n, Inc. v. City of N.Y.*, 487 U.S. 1, 14, 108 S. Ct. 2225, 2234 (1988)).  The overbreadth doctrine is designed to remedy the chilling effects of overbroad statutes–statutes that "have such a deterrent effect on free expression that they should be subject to challenge even by a party whose own conduct may be unprotected." *Taxpayers for Vincent*, 466 U.S. at 798, 104 S. Ct. at 2125.  Given the threat to freedom of expression, traditional rules of standing are altered to permit litigants "to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick*, 413 U.S. at 612, 93 S. Ct. at 2916.  Thus, a statute found to be overbroad is "totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Id.* at 613, 93 S. Ct. at 2916.

The Supreme Court, however, has recognized the overbreadth doctrine as "strong medicine" that should be "employed . . . sparingly and only as a last resort." *Id.*  Thus, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 615, 93 S. Ct. at 2918.  The fact that there may be some conceivable

22

impermissible applications is not enough to render a statute overbroad. *Taxpayers for Vincent*, 466 U.S. at 800, 104 S. Ct. at 2126.

In *Board of Airport Commissioners of City of Los Angeles v. Jews for Jesus, Inc.*, the Supreme Court struck down an ordinance banning all First Amendment activity within Los Angeles International Airport as unconstitutional under the overbreadth doctrine. 482 U.S. 569, 574-75, 107 S. Ct. 2568, 2572 (1987). The Court found that the resolution

> [D]oes not merely regulate expressive activity in the Central Terminal Area that might create problems such as congestion or the disruption of the activities of those who use LAX. . . . [I]t prohibits even talking and reading, or the wearing of campaign buttons or symbolic clothing. Under such a sweeping ban, virtually every individual who enters LAX may be found to violate the resolution.

*Id.*

Similarly, here, the prohibition on "any" message about "any" good or service provided by a business is overbroad. Section 46-92 burdens substantially more speech than necessary to further the City's interests. As the district court correctly points out, everything from a PETA demonstrator passing out flyers about a fast-food chain's treatment of animals to a Rabbi distributing a list of restaurants that serve kosher meals could potentially be prohibited under Section 46-92.

Moreover, there is no evidence in the record that this traditional non-commercial speech presents the same problems that commercial handbilling does.

23

The City acknowledges that the problems stem from commercial handbilling and it seeks to regulate only commercial handbilling.  However, Section 46-92 is not worded in a sufficiently narrow manner to target only commercial handbilling. Thus, the district court correctly concluded that Retailers showed a substantial likelihood of success on their claim that Section 46-92 is overbroad.

## IV. CONCLUSION

For the aforementioned reasons, we affirm the district court's order granting the preliminary injunction.

**AFFIRMED.**